BANKERS CAPITAL CORPORATION,
Plaintiff-Respondent,

v.

W. Joseph BRUMMET, et al.,
Defendants,

and

Jack Winkleman, Defendant-Appellant.

No. WD32816.

Missouri Court of Appeals,
Western District.

July 27, 1982.

David C. Christian, Kansas City, for defendant-appellant.

Robert L. Wehrman, Polsinelli, White & Schulte, Kansas City, for plaintiff-respondent.

Before SOMERVILLE, C. J., WASSERSTROM, J., and MOORE, Senior Judge.

WASSERSTROM, Judge.

Plaintiff, Bankers Capital Corporation ("Bankers") sued for breach of contract. The trial court granted Bankers' motion for summary judgment, and defendant Winkleman appeals. We affirm.

In 1976, Brummet and wife, McClanahan and wife, and Rikard were engaged in a jewelry business under the partnership name RiShell Marketing Enterprises ("RiShell"). It found itself in financial difficulty and approached Bankers, a small business investment company, for a loan. Bankers was interested but wanted more collateral security over and above RiShell's assets. McClanahan, who was also engaged in selling insurance, at that point offered to transfer to Bankers as security a promotional plan styled Annuity/Trust Organization Plan ("A/TOP"). A/TOP was essentially an estate planning and tax saving concept devised by McClanahan, the details of which had been worked out by the law firm of Linde, Thomson, Fairchild, Langworthy & Kohn in 1975. Those details and legal commentary thereon had been set forth in a Memorandum of Law by that law firm, and a printed four page sales presentation brochure had been prepared, both of those documents bearing a copyright notice by American Commerce Trust, a trade name under which McClanahan operated.

Bankers answered McClanahan by saying they needed help in placing a valuation upon A/TOP. McClanahan then approached Jack Wheatcraft and defendant Winkleman for that purpose. Wheatcraft at that time was also an insurance agent for the same company as was McClanahan, officed across the hall from him, and had participated with McClanahan in presenting the A/TOP plan to a number of prospects. Those presentations were still actively being pursued. In response to McClanahan's request, Wheatcraft and Winkleman wrote the following letter dated October 7, 1976:

"We, the undersigned, acknowledge that A. Z. McClanahan is pledging the rights to the Annuity/Trust Organization Plan to Bankers Capital as collateral for a loan. We have studied the A/TOP concept, and in our opinion, it is a very marketable concept. Based on our evaluation of A/TOP, we would be interested in buying the copyright to A/TOP if there is default. Should there be a default on the loan and we could take title

to A/TOP, we would be willing to pay A. Z. McClanahan at least $60,000 for the marketing rights."

This letter left Bankers, who was seeking greater liquidity, still dissatisfied. Bob Barnes on behalf of Bankers advised McClanahan that the letter from Wheatcraft and Winkleman was not in a form acceptable to Bankers' attorneys. Barnes stated that those attorneys had presented a different form of agreement which Bankers wanted Wheatcraft and Winkleman to sign before the loan could be made.

McClanahan and Wheatcraft then went to a meeting with Barnes in the latter's office, at which time Wheatcraft signed the agreement which had been prepared by the Bankers' attorneys. The important provisions of that agreement were as follows:

"WHEREAS, Bankers has agreed to loan to RiShell Marketing Enterprises, a partnership, certain sums of money and, as security for the repayment of said loan, taken and received a mortgage and assignment of rights to certain copyrighted materials regarding the Annuity/Trust Organization Plan (hereinafter referred to as "A/TOP"), and

WHEREAS, Bankers took said security from RiShell and based their evaluation thereon based upon Buyer's expressed agreement to purchase said A/TOP copyrights, memoranda and rights thereto, and

WHEREAS, the parties desire to set forth their agreement in writing as to Bankers' agreement to sell A/Top to Buyer in the event of default by RiShell and Buyer's agreement to purchase A/Top from Bankers.

NOW, THEREFORE, the parties hereto mutually agree and promise, for good and valuable consideration, as follows:

1. It is understood between the parties hereto that Bankers' rights to A/Top and all memoranda and rights relative thereto will only vest in Bankers upon a default in said loan from Bankers to RiShell and Bankers' subsequent foreclosure of any mortgage on said copyrights and exercise of its rights pursuant to conditional assignment of all memoranda and rights thereto....

2. In the event that, during the term hereof, Bankers shall obtain, as set forth above, A/Top, the copyrights and rights incident thereto, Bankers shall notify Buyer in writing of Bankers obtaining said rights and the closing hereof shall take place thirty days after said written notice from Bankers to Buyer.

3. At said closing, Bankers shall transfer, deliver and assign to Buyer all of its right, title and interest in and to A/Top, any copyrights regarding A/Top and all rights incidental thereto. Buyer hereby acknowledges that they are aware of, understand and accept the foregoing description as an adequate description of the property to be conveyed hereunder and further, Buyer hereby states that they are familiar with said property.

4. At the closing hereof, Buyer shall pay to Bankers by cash or certified or cashier's check such sum of money as is equivalent to the outstanding principal balance plus accrued interest on the loan from Bankers to RiShell. Buyer hereby consents to any modification, advancement, extension or other alteration of the terms and amount of the loan between Bankers and RiShell...."

Winkleman was not present at the above meeting, but he did sign the agreement very shortly thereafter.

On November 15, 1976, Bankers proceeded to close the loan with RiShell. At that time the RiShell partners signed a $60,000 promissory note, and McClanahan executed a mortgage and conditional assignment of his copyright interests in A/TOP. The mortgage did not describe the copyright being covered but instead left that space blank. However the conditional assignment transferred to Bankers all of McClanahan's interests in the following:

"1. All copyrights or rights thereto regarding the Annuity/Trust Organization Plan including promotional and advertising pamphlets or literature and including all research memoranda, whether prepared by American Commerce Trust or any

person or firm on behalf of American Commerce Trust.

2. All rights to the use of the said Annuity/Trust Organization Plan, ownership thereof and all rights incident thereto.

3. That certain four page A/Top promotional and advertising pamphlet.

4. That certain 50 page Memorandum of Law entitled the Pure Trust dated June 6, 1975 prepared by the law firm of Linde, Thomson, Fairchild, Langworthy and Kohn."

The conditional assignment further provided that Bankers would not exercise its rights under the assignment so long as RiShell was not in default on the $60,000 loan. McClanahan also delivered to Bankers a legal opinion from a copyright specialist to the effect that McClanahan did own good and valid copyright on the advertising brochure.

Notwithstanding the loan from Bankers, RiShell could not overcome its business difficulties and it defaulted on the note obligation. On October 13, 1977, Bankers wrote to Wheatcraft and Winkleman declaring the RiShell note to be in default and making demand that Wheatcraft and Winkleman proceed to purchase A/TOP. Attached to that demand was a copy of the notice of default addressed to RiShell, specifying the amount due for principal and interest to be $58,637.50. By that time A/TOP had proved to be unsuccessful as a marketing tool, and Wheatcraft and Winkleman refused to consummate the purchase.

Thereupon Bankers filed suit in two counts. Count one was against the RiShell partners upon the note. Count two was against Wheatcraft and Winkleman on the agreement of November 12, 1976. After some discovery, Bankers moved for summary judgment against Wheatcraft and Winkleman, which was granted. Default judgment was also entered on Count one against some of the RiShell partners and was dismissed as to others. No appeal has been taken by the RiShell partners. An appeal was taken on behalf of both Wheatcraft

and Winkleman, but upon suggestion of Wheatcraft's death, his appeal has been dismissed. The sole appeal now pending before this court is that of Winkleman.

Winkleman's points on appeal may be grouped and summarized for convenience as follows:

1. Summary judgment should have been entered in favor of Winkleman because:

(a) The agreement of November 12, 1976, is unenforceable because overly vague and lacking in consideration and mutuality.

(b) Bankers failed to perform under that contract.

2. Summary judgment should not have been entered in favor of Bankers, because genuine issues of fact existed as follows:

(a) There was a genuine issue as to whether Wheatcraft and Winkleman intended to enter into a binding agreement to purchase, as against merely giving Bankers an evaluation.

(b) A question existed as to what was included as part of the A/TOP plan.

(c) There was no evidence as to the amount of Bankers' damages.

## I.

### A.

■ In support of his contention that the contract is unduly vague, Winkleman argues that the contract has no definite purchase price. However the purchase price is fixed by the contract as an amount equal to the outstanding principal balance plus accrued interest at the time of default on the loan from Bankers to RiShell. It is sufficient that the consideration to be paid can be made certain by reference to the extrinsic facts so referred to. *Burger v. City of Springfield*, 323 S.W.2d 777 (Mo.1959); *Allied Disposal, Inc. v. Bob's Home Service, Inc.*, 595 S.W.2d 417 (Mo.App.1980).

■ Winkleman also argues that the purchase price is uncertain in that Winkleman would be bound by "any modification, advancement, extension or other alteration of the terms and amount of the loan between

Bankers and RiShell." Winkleman argues that the quoted provision would permit Bankers to increase the loan amount without limit and thereby bind Winkleman to a purchase price without limit. In actuality, there was no increase in the amount of the loan beyond the original $60,000 face amount of the note, and it is at best doubtful whether the phrase above quoted· was intended to permit Bankers to lend money in an amount in excess of $60,000 and bind Wheatcraft and Winkleman to a purchase price in such larger amount.

However that question of interpretation is not presented on the facts of this case and no construction of the agreement in that regard need be undertaken. Even if the quoted provisions were to be interpreted as permitting Bankers to increase the loan beyond $60,000, the increased obligation thereby imposed upon Wheatcraft and Winkleman would not render the purchase contract unenforceable. The purchase agreement in this case is akin to guarantee agreements which very generally are open ended with respect to the amount of credit which can be extended and which becomes the matter of obligation to the guarantors. *See* 38 Am.Jur.2d Guaranty Sections 23 to 25 (1968).

■ Winkleman further argues that the purchase contract is lacking in consideration and mutuality because Wheatcraft and Winkleman were not given an enforceable right to purchase. However it will be observed that under the terms of the contract, Bankers did have the obligation to sell and Wheatcraft and Winkleman had the right to purchase under the conditions specified. The promise by Bankers to sell, even though conditional, is sufficient consideration for the contract. *Shelton v. M & A Electric Power Cooperative*, 451 S.W.2d 375 (Mo.App.1970). This contract is unlike those in cases relied upon by Winkleman in which the rights of one party depended on the wish, will or pleasure of the other party. *See Vondras v. Titanium Research & Development Co.*, 511 S.W.2d 883 (Mo.App.1974).

■ Winkleman further argues that the purchase contract is void because

Wheatcraft and he received no benefit thereunder. Under the evidence, his copurchaser Wheatcraft originally considered the right of purchase as a benefit, since his deposition testimony showed clearly that he had high expectations of making profitable use of the A/TOP plan. But even if neither Wheatcraft nor Winkleman received benefit under the November 12, 1976 agreement, there can be no question but that Bankers suffered detriment. It was in reliance on that contract that Bankers three days later lent $60,000 to RiShell. Either detriment to the promisee *or* benefit to the promisor can constitute good consideration sufficient to support a contract. *Wells v. Hartford Accident and Indemnity Company*, 459 S.W.2d 253 (Mo.banc 1970); *Coffman Industries, Inc. v. Gorman-Taber Co.*, 521 S.W.2d 763 (Mo.App.1975).

## B.

■ In support of its argument that Bankers failed to perform under the purchase contract, Winkleman argues that there was no evidence of any default by RiShell or foreclosure by Bankers, that Bankers did not have possession of all of the A/TOP forms for delivery to the purchasers and that Bankers did not have a judgment against RiShell at the time of demand that the purchase be consummated. Contrary to that argument, the evidence plainly showed without contradiction that a default on the note did occur by RiShell, and notice of that default was given to Wheatcraft and Winkleman. The affidavit of Glasnapp, submitted by Bankers, shows that Bankers had foreclosed on the mortgage of copyright and exercised its rights in accordance with the terms of the conditional assignment. The agreement did not require judgment against RiShell as a precondition to liability on the part of Wheatcraft and Winkleman.

■ The Glasnapp affidavit further states that Bankers "has in its possession the Annuity Trust Organization Plan (ATOP)." It is true that Bankers offered in evidence only the copyrighted material

consisting of the 50 page legal memorandum and the four page printed brochure, and the record is barren with respect to the various forms which had been developed for use in connection with the plan. However those forms could not have been the matter of any great concern to Wheatcraft and Winkleman. Wheatcraft had been one of the two people who had actively attempted to exploit the plan, and beyond any real doubt he must have had copies of these various forms already in his possession.

Regardless of that, however, possession of these forms could not be a matter of any importance. By October 1977, A/TOP had become valueless. Wheatcraft testified on deposition that all the presentations of the plan had proved unsuccessful, primarily because of resistance by the accountants and lawyers representing the prospects. No one was willing to proceed with the plan without having the benefit of an advance ruling from the Internal Revenue Service, which had not and apparently could not be obtained. Wheatcraft testified that an apparently insurmountable obstacle to successful marketing of the plan was created by the provisions of the Tax Reform Act of 1976 which had the effect of negating some of the principal benefits envisioned by A/TOP. In his words, "that just simply virtually nullified its worth." By the time of the deposition, no use of A/TOP was being made and no presentations of the plan were still under consideration. McClanahan, the author and owner of the plan, had disappeared, and his wife and children had turned to Wheatcraft for advice and help occasioned by McClanahan's desertion. Wheatcraft, in his deposition, stated that at that time the A/TOP plan had "little or no value" and that there was "no way at this time perhaps to place a fair market value on it." It is clear that the plan had been abandoned by both McClanahan and Wheatcraft, and if the plan had no value to them, it could hardly have had any value to anyone else. Consequently, whether or not Bankers delivered these useless forms would in actuality be a matter of complete indifference.

■ Winkleman argues still further that there is no evidence as to the registration of the A/TOP copyrights and there is no evidence of any registration of the copyright assignment. However, the copyright comes into being upon publication with a proper copyright notice. Registration is not required for validity. *Weisberg v. U.S. Department of Justice*, 631 F.2d 824 (D.C.Cir. 1980).

■ Likewise the failure to record an assignment of copyright merely makes the assignment inferior to subsequent transfers. 17 U.S.C.A. Section 30, superseded by Section 205(e). No subsequent purchase, assignment or mortgage has intervened under the facts of the present case. Thus, failure to record the assignment is immaterial.

To summarize, Winkleman has failed to show any ground upon which summary judgment should have been entered in his favor.

## II.

### A.

■ Winkleman argues that summary judgment for Bankers was improper in that he should have been permitted to introduce evidence in support of his contention that he and Wheatcraft had merely given an evaluation of the A/TOP plan and had never intended to enter into a binding obligation to purchase that plan for any given sum of money. This contention is wholly inconsistent with the testimony given by Wheatcraft in his deposition. He there stated that he knew that Bankers' objective was "that they were looking for something that they could convert to cash more readily." Wheatcraft knew and understood that the whole purpose of the November 12, 1976 purchase agreement was to supply that liquidity, and he admitted "I agreed to buy the plan." That understanding and intention must be deemed binding upon his partner or joint venturer Winkleman. *Sommers v. Hergenreter*, 523 S.W.2d 176 (Mo. App.1975); *Buder v. Denver Nat. Bank*, 151 F.2d 520 (8th Cir. 1945).

Regardless of that, evidence of Winkleman's intention would be immaterial and inadmissible. The agreement of November 12, 1976, is plainly and unambiguously a contract of purchase. Evidence to prove an intention contrary to the plain terms of the agreement could not be countenanced. *Commerce Trust Company v. Howard*, 429 S.W.2d 702 (Mo.1968); *Grantham v. Rockhurst University*, 563 S.W.2d 147 (Mo.App.1978).

Winkleman seeks to avoid the foregoing rule by claiming, and Wheatcraft's affidavit submitted in opposition to summary judgment stated in conclusory form, that he and Wheatcraft were subjected to high pressure tactics and misrepresentations and were induced to sign the November 12, 1976 agreement without reading it and without the assistance of counsel. The evidence is to the contrary. Wheatcraft in his deposition stated: "I'm not saying that anybody induced me to sign by making claims or anything of that nature, that was not the case * * * No one twisted my arm." Further: "Q. No one put any pressure on you? A. No."

Furthermore any claim of fraud would be an affirmative defense which would have to be pleaded. Rule 55.08. No such defense was pleaded by either Wheatcraft or Winkleman.

### B.

Winkleman argues next that a genuine issue of fact existed concerning just what made up A/TOP. This contention has very little substance. All of the documentation, especially the conditional assignment of copyright, makes fairly clear that what the parties had in mind was principally the copyrighted 50 page legal memorandum and even more especially the four page copyrighted printed brochure.[1] These were the only two items specifically mentioned or described, and anything else useful in connection with the exploitation of those two items were incidental appendages. That Wheatcraft and Winkleman were aware of all this is plainly stated in the provision of the purchase agreement that Bankers was to transfer all of its interest "in and to A/TOP, any copyrights regarding A/TOP and all rights incidental thereto. *Buyer hereby acknowledges that they are aware of, understand and accept the foregoing description as an adequate description of the property to be conveyed hereunder and further, Buyer hereby states that they are familiar with said property.*" (Emphasis added).

Bankers did of course have the two principal documents, the legal memorandum and the sales brochure, and those documents were unquestionably ready for delivery to Wheatcraft and Winkleman. Delivery of any implementing forms was purely incidental and did not go to the heart of the transaction.

However the complete answer to this whole issue is that the exact makeup of A/TOP has become a matter of complete disinterest. The plan and its components no longer have any value and have been wholly abandoned. Winkleman's obligation in this case simply cannot be made to turn on the question of whether some useless

---

1. This understanding is buttressed by the language of the letter opinion from the copyright specialist dated November 11, 1976:

   "I have been asked by A. Z. McClanahan d/b/a American Commerce Trust to render this report and opinion with respect to a copyrighted work entitled "A/TOP Annuity/Trust Organization Plan" which is to be provided by American Commerce Trust as partial security for a loan to be made to the above-captioned organization.

   The work is a four-page advertising and explanatory brochure and bears the proper copyright notice designating American Commerce Trust as the copyright proprietor. According to Mr. McClanahan, a number of copies of this brochure with such notice thereon were mailed on November 4, 1976, to prospective customers and interested parties, thereby effecting a public distribution of the work and securing a statutory copyright therein.

   I am advised that the text and illustrations contained in the subject brochure were either prepared by Mr. McClanahan or by others hired or contracted by Mr. McClanahan for this purpose. Accordingly, American Commerce Trust is the copyright proprietor and the copyright notice on the brochure is in proper form."

incidental papers have been tendered to him.

### C.

■ As for his contention that Bankers has not submitted evidence as to its damages, Winkleman tries to argue again as to the present value of A/TOP. He says that the measure of damages here should be the contract price less the present fair market value of A/TOP. The contract price is the unpaid balance due on the RiShell note, which by uncontradicted evidence came to $58,637.50. As for the fair market value, there was none in October 1977 or thereafter. This matter has already been fully discussed and will not be again repeated.

■ On the measure of damages issue, Winkleman attempts to raise the specter that Bankers may have "triple recovery." He arrives at this by saying that Bankers has A/TOP for whatever it is worth, it now undertakes to collect from Winkleman, and in addition it may collect yet again from the RiShell partners. As to any recovery from the value of A/TOP, as already fully discussed, that has no value. Bankers does of course have a judgment against some of the RiShell partners, in addition to the judgment now outstanding against Winkleman and Wheatcraft. However, plaintiff bargained for and is entitled to receive this alternative right of recovery against Winkleman. That is all which it is necessary to decide in this case. Whether collection by Bankers from defendant Winkleman under Count II will satisfy the judgment against RiShell under Count I, and if so, whether Winkleman might then have right of subrogation against RiShell are not matters for decision here.

Affirmed.

All concur.