ALLIED DISPOSAL, INC., a Corporation, Plaintiff-Appellant,

v.

BOB'S HOME SERVICE, INC., Chem-Dyne Corporation, James Zykan and Mike Zykan, Defendants-Respondents.

No. 41092.

Missouri Court of Appeals,
Eastern District,
Division Four.

Feb. 13, 1980.

Motion for Rehearing or Transfer to Supreme Court Denied March 14, 1980.

Application to Transfer Denied
April 8, 1980.

Niedner, Moerschel, Ahlheim & Bodeux, Rollin J. Moerschel, St. Charles, for plaintiff-appellant.

Daniel P. Card, III, Chester A. Love, Thomas K. Edelmann, Clayton, for defendants-respondents.

SMITH, Presiding Judge.

Plaintiff, Allied Disposal Inc., appeals from an order of the trial court dismissing with prejudice its three count petition. Count I sought money damages against defendant Bob's Home Service Inc. for breach of contract. Count II sought actual and punitive damages against defendants Chem-Dyne Corporation and the Zykans for tortious interference with the contract between plaintiff and Bob's. Count III sought injunctive relief against all defendants to prevent their interference with plaintiff's exercise of its rights under the contract. We reverse and remand.

The contract upon which the litigation was based dealt with land owned by Bob's. This land, the Muenz site, was a waste disposal site which was authorized by the State of Missouri for disposal of chemical wastes. Plaintiff is engaged in the business of waste and trash disposal, including disposal of chemical waste. On March 25, 1977, Allied and Bob's entered into an agreement which provided:

(1) Allied would have ingress and egress to the Muenz site on routes reasonably selected by Bob's.

(2) Allied would be the exclusive user, agent and broker of the site except for the use by Bob's to service its current customers and certain identified potential customers. No use of the site could be made by any other person or business without Allied's written consent.

(3) Allied would use only the Muenz site for disposal of chemical waste it hauls and would not use any other site without the written permission of Bob's.

(4) The parties would use their best efforts to obtain necessary state permits for each type of waste to be disposed of on the site and would use the same efforts to obtain federal permits if necessary.

(5) Allied would reimburse Bob's for any loss suffered because of waste brought to the site in violation of state permit or which was mislabeled.

(6) Each party would be responsible for adhering to the State rules pertaining to its phase of the operation.

(7) "The price that 'Allied' shall pay 'Bob's' for the use of the site shall be mutually agreed upon by the parties for each contract of hauling that 'Allied' has."

(8) Allied would pay for any increase in costs of operating the site resulting from changes in the rules of the State even after the price had been determined by the parties unless waived by Bob's.

(9) The parties would make available their records and would account to each other.

(10) Allied would use the site as allowed by the State for disposal, temporary or permanent, of waste resulting from industrial or traffic accidents and acts of God at a price to be "as mutually agreed upon by the parties."

(11) The contract would be for a term of three years with automatic renewal for one year unless notice of election not to renew was given 6 months prior to the expiration date.

(12) Payments for each month would be made by Allied within 15 days of billing

which was to be done on the first of each month for the preceding month's service.

(13) Each party gave the other the "right of first refusal" to purchase respectively the business of Allied or the site of Bob's. Any other purchaser of either was bound by the terms of the contract.

(14) "Both parties agree that an equity court may be used to enforce any and all parts of this agreement."

Contemporaneously with the execution of this contract the principals of the two contracting parties entered into an agreement in which they agreed (among other things) not to directly or indirectly compete with the contracting corporations.

Plaintiff alleged that it duly performed its obligations but that after October 13, 1977, defendant breached the agreement by not allowing plaintiff access to the site and by authorizing Chem-Dyne to assume control of the site and by permitting Chem-Dyne to use the site in competition with plaintiff resulting in damage to plaintiff. Count II alleged that defendants Chem-Dyne and Zykan, with knowledge of the contract, induced Bob's to repudiate and cancel the contract with plaintiff and to enter into a contract with Chem-Dyne to plaintiff's injury. Count III set forth allegations of its injuries supportive of injunctive relief. That count includes an allegation that fees for the use of the site "were invoiced monthly and paid regularly by plaintiff."

■ In ruling on a motion to dismiss both we and the trial court must accept as true all well pleaded facts and the reasonable inferences favorable to the pleader to be drawn therefrom. If those facts and those inferences evidence the existence of any cause of action, the petition should not be dismissed. *Shapiro v. Columbia Union Nat. Bnk. & Tr. Co.,* 576 S.W.2d 310 (Mo. banc 1979) [1]; *State ex rel. Sisters of St. Mary v. Campbell,* 511 S.W.2d 141 (Mo.App.1974) [1, 2]. We review this case on that basis.

Defendants' motions are based upon the contention that the provision numbered (7) *supra,* is vague and indefinite rendering the

agreement nugatory. It is contended that the provision is an agreement to agree on the price and, therefore, an essential element of the contract has not been agreed upon. The dismissal of all counts was apparently based upon the trial court's conclusion that the contract was invalid or nonexistent for that reason. This was the only basis set forth in the motions to dismiss and in the brief of respondents here. We find no other basis for the dismissal.

■ Both parties have discussed the matter in part as if it were a question of lack of consideration. That is not the question. It is apparent that the parties each undertook a series of promises. Mutual promises imposing some legal duty or liability on each promisor are sufficient consideration to form a valid, enforceable contract. *Bengimina v. Allen,* 375 S.W.2d 199 (Mo. App.1964). *See also Charles F. Curry and Company v. Hedrick,* 378 S.W.2d 522 (Mo. 1964) [11–13]. Allied has agreed that it will use no chemical waste disposal site except Bob's. Bob's has agreed it will allow no one else to use its site. This agreement of mutual exclusivity is sufficient consideration in and of itself to support the contract without regard to the many other promises running between the parties.

■ We turn to whether the contract is void for vagueness. It has been the general rule that an agreement must fix a price or provide a method to ascertain the price in order to form an enforceable contract. *Barling v. Horn,* 296 S.W.2d 94 (Mo.1956) [1, 2]. An exception to that rule is that where there is no statement at all as to price and the contract has been executed, the law implies a standard of reasonableness. *Law v. Taylor,* 330 S.W.2d 170 (Mo.App.1959) [4, 5].

Where the price is to be agreed upon in the future, the agreement often fails for indefiniteness, unless the contract has been executed. *Stout v. Carruthersville Hardware Co.,* 131 Mo.App. 520, 110 S.W. 619 (1908). Some courts view "an agreement to agree" as meaning that there has been no meeting of the minds sufficient to conclude

a contract. *Bengimina v. Allen, supra,* [7]. Other courts view such a promise as illusory; that is—the parties have only promised to pay what they choose to pay and need not agree to any amount. *Livingston Waterworks v. City of Livingston,* 53 Mont. 1, 162 P. 381 (1916). Where a term is left to be agreed upon in the future, courts have apparently regarded this as a rejection of the standard of reasonableness, thus the term cannot be supplied by implication. 17 Am.Jur.2d Contracts § 26 (1963).[1]

The same general rules have not been applied to all contracts. The distinctive nature of some contracts has caused courts to uphold them even where there is no more than an agreement to agree on price. This approach was adopted in *United States v. Swift and Company,* 270 U.S. 124, 46 S.Ct. 308, 70 L.Ed. 497 (1926), where the contract provided for a specified quantity of bacon for a price "to be determined later." In upholding the validity of the contract the Court looked to the impossibility or difficulty of establishing the price before performance of the contract and held that a reasonable price was presumed to be intended.

Similar considerations have been applied to exclusive sales and distribution agreements because of their distinctive nature. In *Mantell v. International Plastic Harmonica Corporation,* 141 N.J.Eq. 379, 55 A.2d 250 (1947) the court was confronted with an exclusive sales and distribution agreement where "it was not practical to fix a free price" because the product had not been perfected and the production capacity was speculative. The court held the contract valid despite the absence of an agreement on price, concluding that the standard of reasonableness was implicit in the contract. The court's closing analysis of the reasons for its ruling are of value here:

"This type of contract is a comparatively recent device to meet modern needs in the marketing and distribution of goods on a nation-wide or regional scale. In the very nature of the exclusive sales and distribution contract, it is not usually practicable to fix prices and the quantum of goods sold; and the rules of certainty and definiteness which govern the ordinary contract of sale have no application. Unlike a pure contract of purchase and sale, agreements of this class embody mutual promises and obligations with sufficiently definite standards by which performance can be tested. The grant of the exclusive franchise is a consideration for the grantee's obligation to establish and develop a market for the sale and distribution of the product in the area covered by the monopoly. The character of the contractual arrangement is such as to preclude explicitness as to quantity and prices. This is especially so where, as here, the product is new and untried and its potential worth and market value and the cost of manufacture and distribution are unknown quantities. Such contracts have the requisite mutual assent and consideration. They are not comparable to the ordinary executory agreement to buy and sell goods. (Citations omitted)

"Contracts of this category are to be given a practical interpretation that will effectuate and not defeat the common intention in an area of conventional action that, due to unpredictable market conditions, production factors, and so on, ordinarily does not permit of greater certainty and definiteness in the particulars mentioned." [10, 11, 12].

*See also Laveson v. Warner Mfg. Corp.,* 117 F.Supp. 124 (D.N.J.1953).

We also must take note of the fact that the earlier cases in Missouri on vagueness and indefiniteness have been largely rendered obsolete by the enactment of the Uniform Commercial Code, at least as they pertain to sales of goods. Section 400.2–204(3) R.S.Mo.1978 provides: "Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a con-

---

1. But *see* Prosser, Open Price in Contracts for the Sale of Goods, 16 Minn.L.Rev. 733 (1932) l.c. 745, in which the author, while acknowledging that approach to be that taken by the majority of courts, contends that such an approach is based upon the assumption that the parties contracted to be unreasonable.

tract and there is a reasonably certain basis for giving an appropriate remedy." Section 400.2–305 R.S.Mo.1978, deals even more specifically with contracts in which the price is not settled. In such a case the contract is valid if the parties intended to contract. The price is a "reasonable price at the time of delivery if . . . (b) the price is left to be agreed by the parties and they fail to agree; . . .." Although these provisions do not apply specifically to contracts for services they do reflect a legislative policy of the state to obviate the prior doctrine invalidating contracts where the price was left to further agreement. Restatement of Contracts (Second) (Tentative Draft) deals with the same subject matter in Section 32—"Certainty." The approach taken there closely parallels that of the Uniform Commercial Code. Comment e states that "similar principles apply to contracts for the rendition of service." Additionally reference is made in the Restatement (Comment b) to that provision of the Uniform Commercial Code concerning remedy heretofore set forth. The rationale of that provision is analyzed as follows:

"Thus the degree of certainty required may be affected by the dispute which arises and by the remedy sought. Courts decide the disputes before them, not other hypothetical disputes which might have arisen. It is less likely that a reasonably certain term will be supplied by construction as to a matter which has been the subject of controversy between the parties than as to one which is raised only as an afterthought. In some cases greater definiteness may be required for specific performance than for an award of damages; in others the impossibility of accurate assessment of damages may furnish a reason for specific relief. Partial relief may sometimes be granted when uncertainty prevents full-scale enforcement through normal remedies."

■ We conclude, therefore, that the present state of the law recognizes that an "agreement to agree" on price does not preclude, in and of itself, the validity of a contract.

■ Here it is apparent from the allegations that the parties intended to contract. They operated under that contract for several months and the petition does not reflect that the allegedly vague term has been a subject of controversy. The nature of the business is unusual and is subject to extensive state regulation. Sec. 260.350 et seq. R.S.Mo.1978. The contract was for an exclusive system of service between the parties and it was in the mutual interest of each to arrive at an agreement on price. While the contract is not strictly an exclusive sale and distribution agreement, it is very similar to that type of contract and the reasons enunciated in *Mantell, supra,* to support that decision have equal application here. It is at least to be inferred that each type of waste to be disposed of under the contract required different handling because of state (and possibly federal) regulation and that establishing a price in advance for each type was difficult or impossible. The contract so reflects. The parties reference to the availability of equitable relief evidences their knowledge of the unusual nature of the contracted for services. On the record before us the allegations of the petition are sufficient to indicate that plaintiff has a cause of action under the rationale of the Uniform Commercial Code, the Restatement, *United States v. Swift and Company, supra, Mantell v. International Plastic Harmonica Corp., supra,* and *Laveson v. Warner Mfg. Corp., supra,* which rationale we find sound and persuasive. We do not find the contract invalid for vagueness or indefiniteness on the record before us and conclude that the trial court erred in dismissing the petition on that ground.

Because no other grounds for the dismissal were asserted by defendants or the trial court and because we have found none, we hold that all three counts of the petition were improperly dismissed.

Order of dismissal as to all counts set aside and cause remanded for further proceedings.

SATZ, J., and ALDEN A. STOCKARD, Special Judge, concur.