

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-30-2004

# Echols v. Pelullo

Precedential or Non-Precedential: Precedential

Docket No. 03-2740

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Echols v. Pelullo" (2004). *2004 Decisions.* Paper 422.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/422

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS FOR THE
THIRD CIRCUIT

————————

No. 03-2740

————————

ANTWUN ECHOLS,
an individual

v.

ARTHUR PELULLO, an individual;
BANNER PROMOTIONS, INC.,
a Delaware Corporation,
Appellants

————————

Appeal from the United States
District Court for the
Eastern District of Pennsylvania
(D.C. Civil No. 03-cv-01758)
District Court Judge:
Clarence C. Newcomer

————————

Argued February 24, 2004
Before: RENDELL, BARRY
and ROSENN, Circuit Judges.

(Filed: July 30, 2004)

————————

George A. Bochetto      [ARGUED]
Bochetto & Lentz
1524 Locust Street
Philadelphia, PA 19102

Harry P. Marquis
112 Graces Avenue, Suite 120
Las Vegas, NV   98101
    *Counsel for Appellant*

Robert A. Burke
Blank Rome
One Logan Square
Philadelphia, PA 19103

Lamont Jones      [ARGUED]
4434 Crenshaw Boulevard
Los Angeles, CA 90043
    *Counsel for Appellee*

————————

OPINION OF THE COURT

————————

RENDELL, Circuit Judge.

A boxing promoter seeks to recover from the District Court's knockout punch aimed, and delivered, at the enforceability of its promotional agreement. Banner Promotions, Inc. entered into a promotional agreement with boxer Antwun Echols, the terms of which left Echols's compensation for participating in bouts secured by Banner subject to negotiation between the two parties, and to renegotiation under certain circumstances. The District Court determined that the agreement's failure to specify minimum compensation for Echols's participation in these bouts rendered it so indefinite as to be unenforceable. For the reasons set forth below, we will reverse.

## I.

Arthur Pelullo is the president and owner of Banner Promotions, Inc. ("Banner"), a company engaged in the promotion of professional boxers and professional boxing matches. Antwun Echols is a professional boxer with a current record of twenty nine wins, five losses and one draw.

In November 1999, Echols signed a Promotional Agreement ("the Agreement") with Banner, receiving a $30,000 signing bonus. The Agreement granted Banner "the sole and exclusive right to secure all professional boxing bouts requiring [Echols's] services as a professional boxer and to promote all such bouts" for a term of at least four years, and possibly longer, if certain conditions were met. In essence, the Agreement gave Banner the right to be Echols's sole representative in negotiations with any third parties that were interested in having Echols box on their television networks, in their arenas, or against boxers they represented.

Banner's major obligation under the Agreement was to "secure, arrange and promote" not less than three bouts for Echols during each year of the contract. Banner had sole discretion to determine the time and place of each bout. While Echols had to approve each opponent, his approval could not be "unreasonably withheld." Under Section Five of the Agreement, Banner could satisfy its obligation to secure a bout "if it shall have made a bona fide offer in writing irrespective of whether such [b]out actually takes place for any reason other than Banner's nonperformance."

Section Six of the Agreement delineated Echols's compensation for his appearance in the bouts secured by Banner:

> Your purse for all bouts covered by this agreement shall be structured as follows (a) non television, not less than $7,500.00 (b) Univision, not less than $10,000.00 (c) Telemundo, not less that $10,000.00 (d) ESPN 2, Fox Sports or small pay-per-view, not less than $20,000.00 plus $10,000.00 training expenses. (e) HBO AFTER DARK as a challenger or in a non title bout, not less than $45,000.00 plus $10,000.00 training expenses. (f) HBO AFTER DARK as a World Champion not less than $80,0000.00 plus $10,000.00 training expenses. (g) HBO as a challenger or in a non-title bout, not less than $50,000.00 plus $10,000 training expenses. (h) HBO as a World Champion, not less than $125,000.00 plus $15,000.00 training expenses.

Thus, Banner was to pay Echols not less than a stated minimum amount for each bout in which he appeared, with the amount of the minimum depending on where the bout was televised and whether Echols appeared as a champion or not. However, these "minimum purses" could be subject to renegotiation, or the entire Agreement cancelled, at Banner's option, by operation of Section Eight, which provided that "[i]f during the course of this Agreement Boxer should lose any bout, Banner shall [sic] the right but not the obligation to rescind this Agreement or the purses set forth in paragraph (6) shall be subject to renegotiation."

One month after entering the Agreement, Echols lost a world championship bout to Bernard Hopkins, triggering Section Eight. Banner chose not to exercise its right to rescind the Agreement, but took the position that Echols's compensation would thereafter be negotiated on a bout-by-bout basis. Indeed, the parties proceeded to negotiate several individual bout purse agreements in the years after the loss to Hopkins.

Echols, however, became dissatisfied with the situation. According to him, Banner had made him "take it or leave it" offers - offering him bouts for what he believes is below-market compensation, and then rescinding the offers if he attempted to negotiate for a larger purse. Because the operation of Section Eight eliminated the minimum purses specified in Section Six, Echols felt that he was forced to accept Banner's unsatisfactory offers in order to receive

any compensation at all.

Tension also arose between the two parties over a "step-aside" fee that Banner negotiated on Echols's behalf in connection with a fight in Germany.[1] Echols believed that Banner misrepresented the amount of the "step-aside" fee, telling him that it was less than it actually was, so that Banner could pocket the difference.

Finally, in February 2003, Echols requested information about the purse for a fight on March 15 of that year. Banner offered $30,000. When Echols made a counter-offer, Banner responded by rescinding the offer and stating it would offer the March 15 fight to another boxer. Echols filed this suit shortly thereafter.

II.

In his complaint, Echols alleged that: (I) the Agreement was unenforceable for indefiniteness; (II) Banner and Pelullo breached the covenant of good faith and fair dealing by misrepresenting the amount

---

[1]Under certain circumstances, boxing association rules force a champion to offer to fight the next-ranking contender. If the champion wishes to fight a boxer other than the next-ranking contender, or if a boxer other than the next-ranking contender wishes to fight the champion, they may pay the next-ranking contender to decline the champion's offer and "step aside" for another boxer. Such a payment is known as a "step-aside" fee.

3

of the "step-aside" fee; (III) Banner and Pelullo committed fraud against him by misrepresenting the amount of the "step-aside" fee; (IV) Banner and Pelullo violated the Muhammad Ali Boxing Reform Act ("the Ali Act"), 15 U.S.C. § 6301, by misrepresenting the amount of the "step-aside" fee; and (V) he was entitled to a constructive trust over monies that Banner and Pelullo owed him.

Echols also moved for injunctive relief preventing Banner and Pelullo from asserting their rights under the Agreement in conjunction with a title bout that was to take place in June 2003. The District Court denied the motion, finding that Echols had not established irreparable harm.

Banner and Pelullo then moved to dismiss the Ali Act claim, arguing that because the Ali Act did not apply to boxing matches fought outside the United States and Echols had predicated his Ali Act claim on misrepresentations relating to a match in Germany, Echols had failed to state a claim upon which relief could be granted. The District Court granted the motion.

The defendants then moved to dismiss the remaining claims for lack of subject matter jurisdiction, and both sides moved for partial summary judgment to decide the enforceability issue. The District Court denied the motion to dismiss, holding that the parties were diverse and that the amount in controversy satisfied the statutory requirement for diversity jurisdiction. It then granted Echols's motion for partial summary judgment and denied Appellants' cross-motion, holding that the Agreement was unenforceable for indefiniteness, as the Agreement contained no price term. The parties then settled Echols's remaining claims, with Banner and Pelullo reserving the right to appeal the order declaring the Agreement unenforceable. They now exercise that right.

## III.

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. Our review of an order granting summary judgment is plenary. Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 679 (3d Cir. 2003).

## IV.

A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 497 (1941). Accordingly, we apply Pennsylvania choice of law rules in this case. Pennsylvania courts generally enforce choice-of-law provisions in contracts. Kruzits v. Okuma Mach. Tool, Inc., 40 F.3d 52, 55 (3d Cir. 1994). In this case, Section Nineteen of the Agreement provides that it "shall be governed and construed under the laws of the state of Delaware." Thus, our task is to predict how the courts of

Delaware would resolve this issue if presented with these facts. The District Court, applying principles of Delaware contract law, held that the Agreement was unenforceable. However, we predict that the Delaware Supreme Court would conclude otherwise, and will accordingly reverse.

In Delaware, as in most jurisdictions, a court will not enforce a contract that is indefinite in any of its material and essential provisions. Hindes v. Wilmington Poetry Society, 138 A.2d 501, 503 (Del. Ch. 1958). However, a court will enforce a contract with an indefinite provision if the provision is not a material or essential term. Id. The Delaware courts have not spoken on this issue recently, nor have they ever really focused on what types of contract provisions are material and what types are not, although they noted decades ago that "[t]he general rule is that price is an essential ingredient of every contract." Raisler Sprinkler Co. v. Automatic Sprinkler Co., 171 A. 214 (Del. Super. Ct. 1934) (citation and quotations omitted); see also Hindes, 138 A.2d at 503 ("A provision for compensation is certainly one of the most important aspects of any agreement.").

Here, the District Court held that the operation of Section Eight of the Agreement, which required the parties to negotiate Echols's compensation for appearing in bouts secured by Banner on a bout-by-basis after the December 1999 loss, "removed any mention of price from the agreement." In its view, "the essence of the parties' agreement after [Echols's] loss became a contract to enter into a future contract." Relying on the Raisler Sprinkler court's pronouncement that "an agreement that [parties] will in the future make such contract as they may agree upon amounts to nothing," the District Court deemed the Agreement unenforceable.

We think this conclusion of the District Court is overly simplistic. It would no doubt be correct if the Agreement between Echols and Banner were nothing more than a contract for Echols to appear in a particular bout or series of bouts. If that were the case, Echols's price for appearing in a bout would be a material and essential term, and, consequently, the failure to specify the amount of that compensation or some method of determining that compensation would certainly make the contract indefinite. However, the Agreement does not merely deal with a bout or a series of bouts. Rather, it establishes the relationship between the two parties, a relationship in which Echols promised to fight exclusively for Banner, and Echols desired Banner's services on an ongoing basis. The consideration that Banner paid Echols to secure this promise included a $30,000 signing bonus and a guarantee that Banner would arrange at least three bouts per year for him. While the purses for these bouts were relevant, we do not view them as so material and essential to the understanding regarding the relationship such that providing that

5

certain events could alter the price would render the contract so indefinite as to be invalid.

This is supported by the way in which the Agreement was intended to function. Under Section Four, Banner was obligated to secure three bouts for Echols per year. Under Section Five, Banner discharged its duty to secure a bout "if it shall have made a bona fide offer in writing irrespective of whether such [b]out actually takes place for any reason other than Banner's nonperformance." Notably absent is any requirement that Echols agree to such an offer or that Echols must agree to such an offer before Banner will be deemed to have fulfilled its obligation to him. As a result, the parties could satisfy the terms of the Agreement without any bouts occurring, as long as Echols continued to deal exclusively with Banner and Banner continued to make the required number of bona fide offers.[2] While neither party would likely be pleased with that result, the Agreement - with or without the minimum purse structure in place -

clearly contemplates such an outcome. The Agreement does not require the parties to enter into contracts for individual bouts, so it is not, as the District Court posited, "a contract to enter into a future contract." Thus, it need not specify the terms of those future contracts to be enforceable.

There is a paucity of Delaware law on point, and the pronouncements that do exist are general in nature and quite dated. Under Delaware law, "it is well settled that an agreement in order to be a legally binding agreement must be reasonably definite and certain in its terms." Most Worshipful Prince Hall Grand Lodge of Free & Accepted Masons of Delaware v. Hiram Grand Lodge Masonic Temple, 80 A.2d 294, 295 (Del. Ch. 1951). More recent authorities in the area of contracts have considered the concept of definiteness; specifically, the Restatement (Second) of Contracts § 33(2) provides that "[t]he terms of a contract are reasonably certain if they provide a basis for determining the existence of breach and for giving an appropriate remedy." And, Comment e to this section specifically acknowledges that price terms can be indefinite in certain situations, setting forth tests that apply to contracts for the sale of goods, and the rendition of services - which the instant contract would appear to be.[3] The

---

[2]The dissent opines that under our interpretation of the contract Banner could comply with the contract terms by making offers for fights at any price. However, this contention ignores the contractual requirement that the offers be "bona fide," and the covenant of good faith and fair dealing implied in contracts under Delaware law. Cincinatti SMSA Ltd. P'ship v. Cincinatti Bell Cellular Sys. Co., 708 A.2d 989, 992-93 (Del. 1998).

---

[3] Comment e, concerning Indefinite Price, provides:

Where the parties manifest an intention not

material and essential terms of the Agreement here satisfy the Restatement test. Echols breaches the contract if he deals with some entity other than Banner; if he were to breach in this manner, Banner might be entitled to injunctive relief prohibiting him from dealing with that entity and possibly money damages. Banner breaches the contract if it fails to pay the signing bonus or fails to make three bona fide offers per year; if it were to breach in this manner, Echols might be entitled to rescission and possibly money damages. More importantly, there is no breach in the event that Banner and Echols are unable to reach an agreement on a purse for a particular bout. And there is no uncertainty as to what occurs

---

to be bound unless the amount of money to be paid by one of them is fixed or agreed and it is not fixed or agreed there is no contract. Uniform Commercial Code § 2-305(4). Where they intend to conclude a contract for the sale of goods, however, and the price is not settled, the price is a reasonable price at the time of delivery if (a) nothing is said as to price, or (b) the price is to be left to be agreed by the parties and they fail to agree, or (c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded. Uniform Commercial Code § 2-305(1). Or one party may be given the power to fix the price within limits set by agreement or custom or good faith. Similar principles apply to contracts for the rendition of services.

in such an event. The terms of the Agreement are quite clear that Echols must continue to deal only with Banner and that Banner must continue to secure bouts for and to promote Echols for as long as the Agreement lasts.

While the Delaware courts have not had the opportunity to construe an agreement of this type, there is one case from another jurisdiction that is clearly on point. In Don King Prods., Inc. v. Douglas, 742 F. Supp. 741 (S.D.N.Y. 1990), the court was confronted with a nearly identical issue. A boxer argued that his agreements with a promoter were unenforceable for indefiniteness. The promotional agreement between the two parties provided $25,000 to the boxer in return for the exclusive right to promote his fights for a period of time. Compensation for individual fights was made subject to further negotiation and agreement, with the terms to be set forth in individual bout agreements. The promotional agreement specified floor levels of compensation for all bouts except title bouts, where the purse was to be "negotiated and mutually agreed upon between [the parties]." Id. at 761.[4]

---

[4]The dissent correctly notes that the parties later reached a second agreement, but misstates the effect of that agreement. It established that the boxer would receive a $1.3 million purse for a title bout in Tokyo, Japan, and $1 million per fight for his first three post-Tokyo fights, unless he was the winner in Tokyo, in which case the amount per fight would be subject to

The court found that while the agreement left certain terms open to future negotiation, it was more than an agreement to agree, at least with respect to the exclusivity terms, as it was "explicit and definite about [the boxer's] commitment to fight only for [the promoter] during the life of those contracts and about the minimum consideration he could receive for making that commitment." Id. at 762. The fact that the agreement left open the compensation that would be payable under certain circumstances (i.e., title bouts) did not affect the essential subject matter of the agreement, as "the writing manifests in definite language . . . the agreement to deal exclusively with one another with respect to title defenses and to negotiate in an effort to reach a mutual understanding as to the open price term for such a defense." Id.

Similarly, the failure to specify Echols's purses does not affect the essential subject matter of the contract in the instant case, which is the exclusive

nature of Echols's relationship with Banner and the services that Banner has agreed to perform for Echols in exchange for this exclusivity. The Agreement clearly indicates Echols's obligation to deal only with Banner and Banner's obligation to secure a certain number of bouts for Echols. However, nowhere does it obligate Echols to participate in those bouts, and, in the absence of such an obligation, it is unnecessary for the parties to have agreed in advance upon purses for Echols's participation. The purses were not material and essential terms, and the fact that they were left open to future negotiation does not render the contract unenforceable.

Other courts have enforced agreements that we find analogous to the one at issue here. In Mantell v. Int'l Plastic Harmonica Corp., 55 A.2d 250 (N.J. App. 1947), a contract between a plastic harmonica manufacturer and a distributor did not fix a price for the goods to be distributed. When the manufacturer sought to have the contract declared invalid for failure to set a price, the court noted that the agreement was not purely one for the sale and purchase of goods. Instead, it was one for an exclusive right to distribute the goods in a certain region, and the consideration offered by the distributor was for these rights.

This type of contract is a comparatively recent device to meet modern needs in the marketing and distribution of goods on a nation-wide or regional scale. In the very nature of the exclusive sales and

negotiation with $1 million as a floor. Don King, 742 F. Supp. at 762. It did not establish a $1 million minimum purse guarantee for all title bouts. If the boxer fought in a title bout after the three post-Tokyo fights, there was no minimum guarantee for that fight in either the original contract or the second agreement. Thus, even after the second agreement, when the court decided the case, there were still fights for which there were no minimum purse guarantees.

distribution contract, it is not usually practicable to fix prices and the quantum of goods sold; and the rules of certainty and definiteness which govern the ordinary contract of sales have no application. Unlike a pure contract of purchase and sale, agreements of this class embody mutual promises and obligations with sufficiently definite standards by which performance can be tested. *The grant of the exclusive franchise is a consideration for the grantee's obligation to establish and develop a market for the sale and distribution of the product in the area covered by the monopoly. The character of the contractual arrangement is such as to preclude explicitness as to quantity and prices.* This is especially so where . . . the product is new and untried and its potential worth and market value and the cost of manufacture and distribution are unknown quantities. Such contracts have the requisite mutual assent and consideration. They are not comparable to the ordinary executory agreement to buy and sell goods.

Id. at 256-57 (emphasis added). As a result, the court enforced the contract despite its failure to set a price for the goods.

In Allied Disposal, Inc. v. Bob's Home Service, Inc., 595 S.W.2d 417 (Mo. App. 1980), a waste disposal company contracted with a waste site owner for exclusive use of the site. The price it was to pay for the use of the site was to vary from month to month, as "mutually agreed upon by the parties for each contract of hauling." Id. at 418. When the waste disposal company sought to have the contract declared void for its failure to specify a price, the court upheld the arrangement, due to its similarity to an exclusive sales and distribution contract. Id. at 420. The open price term merely reflected the parties' knowledge that different types of waste required different disposal methods, and that since there was no way to know in advance how much of each type of waste would be disposed, it was wise to leave the exact price to be negotiated later. Id. at 421.

In Marcor Mgmt., Inc. v. IWT Corp., No. 96-CV-1519FJS, 1998 WL 809011 (N.D.N.Y. Nov. 17, 1998), the parties had entered into a contract under which Marcor paid IWT a sum of money for exclusive marketing rights to IWT's soil remediation technologies. The agreement between Marcor and IWT did not state a price at which IWT would sell its product to third parties identified by Marcor. When IWT argued that the agreement with Marcor was unenforceable because these price terms were left open, the court disagreed, stating that "the fact that a term is left open does not automatically render a contract unenforceable." Id. at *6 (citing Restatement (2d) of Contracts § 33). The court noted that the contract required IWT's consent before it could be bound to any agreement with a third party and concluded that "a reasonable

interpretation of this provision is that the parties would mutually agree upon the price at a later date." Id. Because there was no requirement that IWT enter into future contracts for its services, there was no problem with the fact that the exclusive marketing agreement with Marcor left open the price terms of such contracts.

Although the Agreement between Banner and Echols deals with a very different subject matter from the contracts at issue in Mantell, Allied Disposal, and Marcor, its structure closely resembles the structure of the agreements in those three cases. In each of the three cases, one party bargained for the exclusive right to distribute, use or market the other party's product or service, just as Banner bargained for the exclusive right to promote Echols in the instant situation. In each of the three cases, the prices of specific transactions that might occur within the exclusive relationship were left open, just as the purses for any bouts that Echols might fight during the course of the exclusive promotional agreement were left open here. And, as a practical matter in these fact settings, the price would presumably be affected by certain factors arising later, beyond anyone's control. Leaving the prices to be negotiated at a later time would allow the parties to arrive at a more informed decision. So too, here, losses by Echols clearly would impact the value of his bouts, and later negotiations would better address any such situation.

We recognize that these pronouncements are from courts other than those of Delaware. The Delaware courts have not had an opportunity to confront the issue of price indefiniteness in the context of an exclusive distribution or marketing contract. What little Delaware case law exists regarding indefinite terms tends to arise in situations involving a pure sale of goods or services. See, e.g., Hammond & Taylor, Inc. v. Duffy Tingue Co., 161 A.2d 238 (Del. Ch. 1960) (examining a contract for sale of a business); Hindes v. Wilmington Poetry Society, 138 A.2d 501 (Del. Ch. 1958) (examining a contract for sale of a manuscript); Most Worshipful Prince Hall Grand Lodge of Free and Accepted Masons of Delaware v. Hiram Grand Lodge Masonic Temple, 80 A.2d 294 (Del. Ch. 1951) (examining a contract for a sale of stock); Raisler Sprinkler Co v. Automatic Sprinkler Co. of America, 171 A. 214 (Del. Super. Ct. 1934) (examining a contract for a license). While these older Delaware cases stand generally for the principle that price is an essential term of every contract, we believe this principle would give way if fact patterns were presented, such as those in Mantell, Allied Disposal, and Marcor, where the price left indefinite was not the price of the exclusive relationship, but the price of a transaction occurring within that relationship, and Delaware would address these nuances in the same reasonable manner as the courts did in these cases. Also, because Delaware appears to have embraced the

10

Restatement of Contracts,[5] which addresses, and reflects a more modern view regarding enforceability notwithstanding indefinite price terms, we predict that the Delaware Supreme Court would find the instant Agreement to be enforceable.

We reject not only the somewhat simplistic view of the District Court but also the impassioned view of our dissenting colleague. The issue squarely presented involved indefiniteness in specific terms, not bargaining power, oppression or other factors. The unequal bargaining power of a boxer in the boxing marketplace was not briefed, nor do we think that it should impact our analysis of certainty in contractual terms.

V.

In light of the foregoing discussion, we conclude that the District Court erred when it determined that the Promotional Agreement's failure to specify minimum compensation for

---

[5]Although the Delaware Supreme Court has never relied upon Section 33 of the Restatement, other Delaware courts have cited it with approval. See, e.g., Independent Cellular Telephone, Inc. v. Barker, No. Civ. A.15171, 1997 WL 153816, at *4 (Del Ch. Mar. 21, 1997); Middle States Drywall, Inc. v. DMS Properties-First, Inc., No. Civ. A 95L-01-041 SCD, 1996 WL 453418, at *8 (Del. Super. Ct. May 28, 1996).

Echols's participation in bouts secured by Banner rendered it so indefinite as to be unenforceable. Accordingly, we will REVERSE the District Court's order granting summary judgment in favor of Echols.

ROSENN, Circuit Judge, dissenting.

Boxing is a perennial sport, stretching from the golden days of ancient Greece to present times. The professional life of a boxer, however, is ephemeral and because of the violence of the sport, is limited to a few fleeting years. The possibility of a defeat is always imminent. Thus, a purported contract between a promoter and boxer, which permits the promoter in the event the boxer "should lose any bout" to rescind its obligation to provide any minimum purses, lays all the odds in favor of the promoter.

Boxer Antwun Echols ("Echols") and his promoter, Banner Promotions, Inc. ("Banner") dispute the enforceability of the exclusive promotional agreement that they executed in 1999. The purported contract, drafted by Banner and governed by Delaware law, allowed Banner to retain the exclusive promotional rights to secure all professional boxing bouts for at least four years, but failed to maintain any price term following a defeat. As drafted, Echols must rely on Banner's good will for future compensation, hoping that the promoter will renegotiate acceptable new terms on either a bout-

by-bout or collective-bout basis. If the new financial terms are unacceptable to the boxer, the purported contract does not allow him to look elsewhere. In my mind, this one-sided instrument is not a legal contract. The instrument is not worthy of judicial enforcement, and I believe that the Delaware Supreme Court would hold it unenforceable. I therefore respectfully dissent.

## I.

The majority acknowledges the that Delaware Courts "will not enforce a contract that is indefinite in any of its material and essential provisions." (Maj. Op. at 8) But, the majority rationalizes that the disputed agreement "does not merely deal with a bout or a series of bouts" but with "the relationship between the two parties, a relationship in which Echols promised to fight exclusively for Banner. . . ." (Maj. Op. at 9) Every contract between two parties deals with a relationship, but from the boxer's corner, the essential ingredients of that relationship are the bout or series of bouts and the obligation of the promoter to provide a purse for the boxer.

A professional fight is no mere exhibition. It is a contest for victory and money. The relationship between a promoter and a boxer is meaningless unless the boxer engages in his craft and receives appropriate compensation. Therefore, the bouts and their purses are not only relevant, but material and essential to the relationship. The details spelled out in Section Six of the disputed

agreement with respect to the purses for all bouts reflects how important and material the related parties regarded the purses. The majority's *ipse dixit* statement that the purses are not essential completely ignores the language painstakingly set forth in Section Six.

Boxing can be a brutal business, and fighters have precious little time to capitalize on their talents and age. In this case, the price limits set forth in Section Six guaranteed the minimum compensation that Echols could expect each time he stepped into the ring. Therefore, the essentiality of the minimum price term to the bargain reached between the parties to this contract cannot be denied.

Neither party disputes that from the time the instrument was executed until Echols' first boxing loss, the contract guaranteed Echols minimum purses for each fight. However, following Echols' loss to Bernard Hopkins in 1999, Section Eight of the instrument authorized Banner to either "rescind this Agreement or the purses set forth in paragraph (6) shall be subject to renegotiation." Banner did not rescind, but elected to renegotiate. The majority interprets this clause as requiring that the price terms thereafter must be renegotiated on a "bout-by-bout" basis. (Maj. Op. at 8) However, the District Court interpreted the contract differently, and found the clause in Section Eight to be "undoubtedly ambiguous." (D. Ct. Op. at 8) According to the District Court, the renegotiation clause may also be

12

interpreted to require that following a loss, the entire minimum price structure must be renegotiated all at once, establishing new price minimums to govern the agreement. (D. Ct. Op. at 8) Under this interpretation, the parties would be able to revitalize the instrument following the defeat by renegotiating a schedule of minimum prices that reflect Echols' market value as a fighter with one loss.

I recognize that both interpretations of the renegotiation clause present risks to the parties. If price minimums are to be renegotiated all at once, both parties risk that a new agreement will not be reached and the contract, which they otherwise would choose to maintain, would be voided. On the other hand, if prices are left to be renegotiated on a bout-by-bout basis, the boxer risks that he will be forced to accept whatever minimal price the promoter offers, or not fight at all. For the reasons described below, I believe that under the relevant contract law, the former interpretation is the only enforceable and fair option.

Echols essentially argues that he did not bargain for an agreement where following a loss, he is left to either fight for whatever price Banner offers, or not fight at all. I believe that the general rule of contract law, recognized in Delaware and other jurisdictions, that "price is an essential ingredient of every contract ... for the rendering of services" is intended to protect against exactly the situation that Echols now faces. Raisler Sprinkler Co. v. Automatic Sprinkler Co., 171 A. 214, 219 (Del. Super. Ct. 1935) (citation omitted). See also Middle States Drywall, Inc. v. DMS Properties-First, Inc., 1996 WL 453418, at *7 (Del. Super. May 28, 1996).

The majority holds that while the purses for the fights are "relevant," they are not material and essential because the parties could satisfy the terms of the agreement without any bouts occurring. I acknowledge that under the strict terms of the contract, Banner could make three offers per year for boxing matches with *de minimus* purses, Echols could reject all of Banner's offers, and both parties would be technically compliant with the contract terms. Under this interpretation, a court could determine when a party breaches these terms, thereby providing some level of reasonable certainty in the contract.[6] However, I do not believe that this theoretical certainty changes the essential character and terms of this boxing promotion contract, nor does it make the contract enforceable under Delaware law. Even the most basic service contract would be deemed unenforceable if it failed to state a price term, regardless of whether the contract requires the parties to ever actually exercise their ability to purchase or sell

---

[6] "The terms of a contract are reasonably certain if they provide a basis for determining the existence of breach and for giving an appropriate remedy." Restatement (Second) of Contracts § 33(2).

13

the services. The Delaware Superior Court reinforced this idea in <u>Raisler Sprinkler</u>, explaining that

> [o]ne of the commonest kind of promises too indefinite for legal enforcement is where the promisor retains an unlimited right to decide later the nature or extent of his performance. This unlimited choice in effect destroys the promise and makes it merely illusory. *** But a promise to give anything whatever which the promisor may choose ... is illusory, for such promises would be satisfied by giving something so infinitely near nothing or by performance so indefinitely postponed as to have no calculable value.

171 A. at 219 (quoting Williston on Contracts, vol. 1 § 43).

The majority portrays Section Eight of the purported agreement to allow for certain events to merely "alter" the price structure in the contract. (Maj. Op. at 9) In my view, Section Eight does more than alter the price. It removes the price structure completely, and this renders the contract fatally defective. Under the majority's holding, Echols' loss authorizes Banner to make offers for fights at any price, even below market rates, and still remain technically compliant with the contract terms.[7] I believe this holding "destroys the promise and makes it merely illusory." <u>Id.</u> In reality, all boxers eventually lose,

---

[7] The majority, at note 2, opines that because the agreement requires Banner to make "*bona fide*" offers, a *de minimus* price offer would not be valid under the agreement and may trigger a breach. First, interpreting "*bona fide*" to mean that a court should imply a reasonableness standard to the price term is inconsistent with the majority's holding that the price term is non-essential. Second, I find no case law, in Delaware or elsewhere, establishing that a "*bona fide* offer" implies a reasonable price term. Rather, when used to describe an offer, the term "*bona fide*" refers to an offer intended to produce a legal contract, regardless of whether the price is reasonable. <u>See</u> <u>e.g.</u> <u>Foxboro Co., Inc. v. Soft Systems Engineering, Inc.</u>, 894 F.Supp. 48, 51 (D.Mass. 1995) (explaining that a *bona fide* offer refers to an offer made with an intent to bind); <u>In re Formica Corp. Shareholders Litigation</u>, 1989 WL 25812, at *11 (Del. Ch. Mar. 22, 1989) (explaining that an offer to purchase a company made for the purpose of stimulating stock activity and raising share price is not a *bona fide* offer). Under this definition of "*bona fide*," Banner could make *bona fide* offers for fights at any price, as long as the offer is intended to bind the parties if accepted.

and some live to fight another day. Although a loss may decrease a boxer's market value, and some mechanism to adjust price may be required to account for this lack of certainty in the boxing market, I believe that the Delaware Supreme Court would interpret the prior case law in the state to require the maintenance of some minimum price in order to deem the contract enforceable.

II.

In my view, the sparse case law on this topic also supports the premise that boxing promotions contracts must have at least some minimum price term to be enforceable. Both Banner and the majority cite to Don King Prods., Inc. v. Douglas, 742 F.Supp. 741 (S.D.N.Y. 1990), to support their position in this case. Yet, Don King supports the opposite conclusion. The original contract in Don King set forth minimum prices for all bouts except title bouts, and the parties later reached a second agreement establishing a $1.3 million purse for a title bout and a $1 minimum purse guarantee for the next three fights, subject to renegotiation upwards in price if the fighter, Douglas, should win the heavyweight title. 742 F.Supp. at 748, n5. Therefore, when the court decided the case, there were minimum price guarantees in place, and Douglas was forced to take the position that because his market value as a fighter had risen significantly, the $1,000,000 price minimum was "insufficient to render the

contract sufficiently definite for enforcement." Id. at 761. The court found that the $1,000,000 minimum price was sufficient to bind the parties, and clearly stated that "the *minimum price terms*, together with DKP's upfront payment of $25,000 and its commitments to hold a set number of bouts, clearly did provide an expectancy of compensation for Douglas that was sufficiently definite to induce his promise to fight exclusively for DKP." Id. at 763 (emphasis added). Thus, Don King stands only for the proposition that an exclusive boxing promotion contract with an indefinite price structure, supported at least by *minimum price terms*, is enforceable.

Furthermore, Don King establishes that minimum price terms are considered part of the bargain that a promoter offers a boxer to induce a promise of exclusivity. By failing to consider the minimum price term as an essential component of the bargain in the present case, the majority deviates from the rule established in Don King. Under the majority's holding, a boxer loses the certainty of minimum compensation; the promoter, however, maintains exclusive control. Echols maintains a price guarantee as long as he wins, but receives no minimum price guarantee after a loss, when he is most vulnerable. The effect of the majority's decision is to leave a boxer subject to the whim and mercy of the promoter, once the boxer loses a bout.

Similarly, I believe that the majority's reliance on the Restatement

15

(Second) of Contracts is equally misplaced. Section 33(2) of the Restatement acknowledges that price terms may be indefinite in certain situations. However, Comment e, relied upon by the majority, deals primarily with contracts for the sale of goods, where price may be determined through market forces. To the extent that Comment e may also "apply to contracts for the rendition of services," it also states that "one party may be given the power [to set the price] *within limits* set by agreement or custom or good faith" (emphasis added). In my reading, the contract between Echols and Banner operated in accordance with Comment e before Echols lost a fight, because it did not set specific prices, but allowed Banner to make offers for bouts "within limits," i.e. above the minimum price levels. After the loss, all limits were removed and no formula was set forth to fix prices for purses. Therefore, the contract no longer complied with Comment e.

Finally, the cases cited by the majority from jurisdictions outside of Delaware, Mantell v. Int'l Plastic Harmonica Corp., 55 A.2d 250 (N.J. App. 1947), Allied Disposal, Inc. v. Bob's Home Services, Inc., 595 S.W.2d 417 (Mo. App. 1980), and Marcor Mgmt., Inc. v. IWT Corp., 1998 WL 809011 (N.D.N.Y. Nov. 17, 1998), are all distinguishable in two key respects. First, none of the products or service contracts in these cases included a defined price limit at the time of contract ratification that was relied upon as an essential term in the original bargain. Thus, it is more reasonable in these cases to conclude that price was a non-essential term. Second, the cases cited by the majority dealt with contracts for new products (Mantell), new technology (Marcor), or undefined services (Allied Disposal). Therefore, those contracts all dealt with situations where there was extreme market uncertainty that could not be sufficiently defined at the time of the agreement. The court in Mantell noted that the recent development of contracts with indefinite price terms may be particularly necessary where "the product is new and untried and its potential worth and market value and the cost of manufacture and distribution are unknown quantities." 55 A.2d 250, 389.

Even though individual boxers may be untested, the sport and spectacle of boxing is hardly a new industry with unknown production and distribution costs. If a promoter and a boxer can reasonably agree to minimum purses when the boxer is undefeated, they should be able to agree fairly on them when the boxer has one loss and both retain some bargaining power. The disputed instrument leaves the boxer with no guaranteed purses, no bargaining power, and the promoter in total control of his boxing career for the next several years.

The District Court found the contract unenforceable because the contract is an agreement to negotiate future agreements without specifying its

16

material and essential price terms. (D. Ct. Op. at 10)  I agree with the District Court.

### III.

Therefore, I would hold the contract in this case unenforceable and affirm the judgment of the District Court.