Edward E. BAILEY, et al., Appellants–
Respondents,

v.

HAWTHORN BANK, Respondent–
Appellant.

Nos. WD 74240, WD 74278.

Missouri Court of Appeals,
Western District.

July 31, 2012.

As Modified Oct. 2, 2012.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 2, 2012.

Application for Transfer Denied
Nov. 20, 2012.

88

Robert J. Bjerg, Overland Park, KS, for appellants-respondents.

Mark M. Iba, Robin K. Carlson, and Megan McCurdy, Kansas City, MO, for respondent-appellant.

Before Division One: JAMES M. SMART, JR., Presiding Judge, LISA WHITE HARDWICK, Judge and GARY D. WITT, Judge.

GARY D. WITT, Judge.

Hawthorn Bank ("Bank") appeals following a jury trial in which a verdict was rendered in favor of the plaintiffs, Edward Bailey ("Bailey") and Darlene Briggs ("Briggs").[1] Plaintiffs cross-appeal.[2]

For the reasons explained below, we affirm in part, and reverse in part.

## Factual Background

Since 2000, Bailey owned a business in Lee's Summit, Missouri called Bailey's Wine Bistro. The business served wine and cold food, as it did not have a kitchen. The Bank over the years was Bailey's business lender, providing Bailey a loan to purchase the restaurant (but not the building in which it was located), a line of credit, and provided Bailey business and personal checking accounts.

Near the end of 2008, Bailey spoke to Kurt Lutz ("Lutz"), the "market president of the Independence market" for the Bank, regarding the Bank extending Bailey a significant loan so that Bailey could buy the building in which the restaurant was located, and also so that Bailey could renovate the building to add a kitchen and convert the business into a full service steak and seafood restaurant. It is undisputed that at this time Bailey's Wine Bistro was struggling financially, and had never shown a profit since before it was purchased by Bailey. Absent significant changes the business was on the verge of having to be shut down.

Lutz referred Bailey to another customer of the Bank, Forbes Cross ("Cross"), who was an experienced restaurateur who had owned and operated several successful restaurants in the Kansas City area. Cross agreed to prepare a detailed business plan for Bailey's proposed new restaurant concept. The business plan called for Bailey to purchase the building in which the restaurant was located, do extensive renovations to the building to add a kitchen and upgrade the customer areas. Bailey decided to move forward under this business plan.

Lutz reviewed the business plan that Cross prepared, approved it and recommended that the Bank loan Bailey the sum of $510,000 to execute this business plan. On February 13, 2009, Lutz created a loan summary ("Loan Summary"), which was a

---

1. When discussed in a collective fashion, we will refer to Bailey and Briggs simply as "Plaintiffs."

2. Rule 84.04(j) provides that "[i]f a cross appeal is filed, the plaintiff in the court below shall be deemed the appellant for purposes of this Rule 84.04, *unless the parties otherwise*

*agree or the court otherwise orders."* Because the parties have agreed to allow the Bank to file a brief as the Appellant we will analyze Bank's Points Relied On first, and this Court will deem the Bank to be the Appellant and the Plaintiffs to be Respondents and Cross–Appellants.

detailed document that discussed Bailey's business plan (and attached the plan as support as to why the Bank should loan Bailey $510,000). The Loan Summary based the loan on a 6% interest rate, and calculated the principal and interest payment to be $3,269.59 for the "25 year amortization, 5 year balloon note" on the $510,000 loan. The Loan Summary also stated other relevant conditions, including that "all past due payments" on Bailey's other existing loans with the Bank be "current and maintained with no further delinquency." Finally, the Loan Summary also stated that "Bailey has a source to obtain funding for the proposed down payment, payment of the aforementioned past due payments & overdrafts and some working capital in an amount equal to $120,000." Lutz was aware that the source for the $120,000 was going to be a loan from Bailey's sister, Briggs. Lutz asked Bailey if he needed a letter from the Bank showing its commitment to make the loan and Bailey requested such a letter.

The Bank approved Lutz's proposed loan to Bailey as set forth in the Loan Summary. Lutz then sent Bailey a letter on the Bank's stationery ("Loan Commitment Letter") on February 26, 2009, which stated, in part, the following: "Please accept this letter as confirmation of Hawthorn Bank's *commitment* to provide $510,000 in financing for acquisition and improvements relative to completing a restaurant kitchen and private banquet meeting room and is predicated on an improved 'as constructed' minimal appraised value of $600,000." (Emphasis added.)

Bailey took two other major steps in attempting to re-structure his business in February 2009, after the Bank approved the loan. On February 23, 2009, Bailey had Briggs wire $120,000 from her bank account in Texas to the Bank. Briggs spoke to Lutz personally, and Lutz assisted Briggs in making the wire transfer. Briggs obtained the $120,000 by borrowing the funds and placing a mortgage on her previously unencumbered home in Texas. Bailey also entered into a contract to purchase the building in which the business was located for the purchase price of $540,000.

It is undisputed that the Bank never loaned Bailey the $510,000 as contemplated by the Loan Summary and Loan Commitment Letter. The parties dispute what events transpired to cause the failure of the loan to close. But it is undisputed that after this dispute, Bailey was forced to close his business.

Plaintiffs then brought suit against the Bank. In their First Amended Petition, Bailey alleged causes sounding in contract, fraud, negligent misrepresentation and promissory estoppel, and Briggs also alleged causes of action against the Bank for negligent misrepresentation and promissory estoppel.

The case was tried to a jury from February 22 through 25, 2011. At trial, Bailey argued that from February 26 to May 22, 2009, Lutz ignored Bailey's repeated inquiries and pleas to close on the $510,000 loan. In response, the Bank contended that there was no enforceable agreement between the parties. The Bank further contended that there was reason for the Bank not to close on the loan immediately because the parties agreed that the property had to be appraised, and that it was the appraiser that failed to provide the requisite appraisal until March 31. The Bank also produced evidence to support its contention that Bailey would not have had the funds required to close on the Loan, as required by the purported agreement.

At the conclusion of the trial, the jury returned verdicts in favor of Bailey on his claims against the Bank for breach of con-

tract and negligent misrepresentation.[3] Bailey was awarded $310,000 in actual damages, and, in addition, punitive damages in the amount of $200,000 on his claim of negligent misrepresentation.

The jury also returned verdicts in favor of Briggs on her claims for negligent misrepresentation and promissory estoppel. Briggs was awarded actual damages in the amount of $120,000, but the jury did not award any punitive damages on her claims.

The parties filed post-trial motions, the bulk of which were denied by the trial court. The trial court initially entered judgment on the jury's verdicts, but on August 5, 2011, the Court entered an amended judgment that granted the Bank's motion for judgment notwithstanding the verdict solely as it pertained to the jury's punitive damage award of $200,000 to Bailey. Thus, the trial court struck down the jury's award of punitive damages, but entered judgment otherwise in accordance with the jury's verdict in all respects.

Both the Plaintiffs and the Bank now appeal.

Further details will be outlined as relevant in the analysis section herein.

## Analysis

In Point One, the Bank argues that the trial court "erred in denying the Bank's motion for judgment notwithstanding the verdict because the Missouri Credit Agreement Act bars Plaintiffs' contract and tort claims in that the purported written credit

agreement on which Plaintiffs sued did not provide for the payment of interest or set forth the relevant terms and conditions."

"When the grant or denial of a directed verdict or a JNOV is based upon a matter of law ... we review the trial court's decision *de novo.*" *Trinity Lutheran Church v. Lipps,* 68 S.W.3d 552, 557 (Mo.App. E.D.2001). Because resolving the instant issue turns on the "interpretation of a statute," the parties on appeal do not dispute that our review is *de novo.* *See Montgomery v. Wilson,* 331 S.W.3d 332, 338 (Mo.App. W.D.2011).

Sections 432.045[4] and 432.047 collectively require that credit agreements be in writing.[5] Section 432.047.2 provides that "[a] debtor may not maintain an action upon or a defense, regardless of legal theory in which it is based, in any way related to a credit agreement unless the credit agreement is in writing, provides for the payment of interest or other consideration, and sets forth the relevant terms and conditions." A "credit agreement" is defined as "an agreement to lend or forbear repayment of money, to otherwise extend credit, or to make any other financial accommodation." Section 432.047.1.

Here, "there is no dispute that the agreement upon which [the Bank] based its affirmative defenses is a credit agreement." *BancorpSouth Bank v. Paramont Properties, LLC,* 349 S.W.3d 363, 366 (Mo. App. E.D.2011). The question is whether the credit agreement in this case falls

---

3. Prior to submission of the case to the jury, Bailey voluntarily dismissed his fraud and promissory estoppel claims.

4. All statutory citations are to RSMo 2000 as updated through the most recent cumulative supplement, unless otherwise indicated.

5. These two statutes are very similarly worded, but we analyze the language of Section

432.047 because it is the broader of the two statutes and provides that for claims that fall within its terms it precludes any lawsuit "regardless of legal theory in which it is based." No party to this appeal disputes that *both* statutes apply to the instant lawsuit because plaintiffs brought claims sounding in contract and tort.

within the terms of Section 432.047. "Under the terms of Section 432.047, to be enforceable, this credit agreement clearly had to be in writing." *Id.*

■ Here, the Bank argues that "the parties never entered into a written credit agreement" pursuant to Section 432.047, and thus Bailey's contract claim is barred under this statute. We disagree.

All that Section 432.047 requires of a "credit agreement" is that it: (1) be "in writing," (2) "provide[ ] for the payment of interest or for other consideration," and (3) "set[ ] forth the relevant terms and conditions." *Id.* "[T]he primary rule of statutory interpretation is to give effect to the legislative intent as reflected in the plain language of the statute." *Akins v. Dir. of Revenue*, 303 S.W.3d 563, 565 (Mo. banc 2010).

When one puts together the Bank's letter of Commitment and the Loan Summary, which were admitted into evidence at trial, the agreement, as reflected in those documents was indisputably "in writing." Furthermore, the Loan Summary provided "for the payment of interest." Specifically, the Loan Summary calculated interest based on a 6% interest rate, and even went as far as to calculate the *precise* monthly principal and interest payment to be $3,269.59 for the "25 year amortization, 5 year balloon note" on the $510,000 loan. Thus, the Loan Summary also "sets forth the relevant terms and conditions," including that "all past due payments" on Bailey's other loans with the Bank be "current and maintained with no further delinquency." The Bank approved the loan, based on this loan summary and the Business Plan.

The Bank argues that the Loan Summary does not constitute a "credit agreement" pursuant to the statute because the parties did not have an agreement in light of the fact the Loan Summary states that the interest rate is "*TBD–6% fixed rate proposed.*" (Emphasis added.) But Section 432.047 does not require that the rate of interest be fixed in a definite and absolute fashion, it only requires the "credit agreement" "provide[ ] for the payment of interest or for other consideration." Here, it did "provide for the payment of interest" because it was unambiguous that Bailey would be required to pay interest pursuant to the credit agreement.

■ The Bank further argues, without citation to any authority, that because the precise interest rate was subject to change in the future prior to the loan closing, that the Bank and Bailey had not reached an agreement. We disagree. Section 432.047 does not specifically address the enforceability of the credit agreement and in fact subsection 4 of this section specifically provides that this section does not affect the creditor's right to enforce a credit agreement. This section is solely a limitation on the ability of a debtor to maintain an action against a creditor under such an agreement or a limitation upon what defenses may be available to a debtor. The question is not whether all of the elements of a contract were entered into by the parties, but what minimum requirements must be met before a debtor can proceed with *any* cause of action or defense to a credit agreement, not just a breach of contract action. Those minimum requirements under the statute are: (1) in writing, (2) provides for the payment of interest or other consideration, and (3) sets forth relevant terms and conditions. 432.047.

■ However, even if this section were read to show the requirements of an enforceable contract, Missouri law is clear that "[t]he fact that some terms of the written agreement were not capable of ascertainment at the time the agreement

was entered into and these precise terms were to be determined by mutual agreement in the future when they became ascertainable did not make the contract unenforceable." *Smith Moore & Co. v. J.L. Mason Realty & Inv., Inc.*, 817 S.W.2d 530, 533 (Mo.App. E.D.1991); *see also Allied Disposal, Inc. v. Bob's Home Service, Inc.*, 595 S.W.2d 417, 420 (Mo.App. E.D. 1980) ("The distinctive nature of some contracts has caused courts to uphold them even where there is no more than an agreement to agree on price."). In *Smith Moore*, the Eastern District went so far as to reject the appellant's contention that "the trial court erred in refusing to grant their motion for a directed verdict because the evidence did not show the parties had mutually agreed to the essential terms of a contract to provide financing including: the principal amount to be borrowed, the due date, *the rate of interest*, the security for the loan and the date which the loan was to be repaid." *Id.* (emphasis added). The Court rejected this argument because the agreement in question "clearly set forth that [Smith Moore] was to arrange financing for the Sugarpines project" and "[a]lthough by necessity there were outstanding items to be decided in the future, the parties did agree that Smith, Moore would arrange the financing for the Sugarpines project and would in turn receive a two percent underwriter discount of the amount arranged to be financed." *Id.* at 532–33.

Here, *Smith Moore* helps illustrate how relatively detailed the Loan Summary document was as it pertained to the financing because, unlike the document in *Smith Moore*, the Loan Summary in the case at bar specifically provided "the principal amount to be borrowed, the due date . . . the security for the loan and the date which the loan was to be repaid." *Id.* at 533. The only term that was not fixed was the interest rate, which is a condition that fluctuates day to day so it would not be unreasonable to set a specific percentage at a later date. *See generally In re Marriage of Tappan*, 856 S.W.2d 362, 367 (Mo. App. S.D.1993) ("The trial court was obviously aware, as are we, that interest rates fluctuate."). Accordingly, we must reject the Bank's argument in this regard.

■ Finally, the Bank argues that the Loan Summary was not a "credit agreement" pursuant to the statute because "Bailey never received the Loan Summary until after he filed suit" and "Bailey offers no authority that would allow an internal memorandum, never given to the borrower, to satisfy the Credit Agreement Statute." [6] But the Bank does not dispute that Section 432.047 is in the nature of a statute of frauds, which is an affirmative defense that has to be pled and proven by the party raising the defense. *See generally Ozark Air Lines, Inc. v. Valley Oil Co., L.L.C.*, 239 S.W.3d 140, 145 (Mo.App. W.D. 2007) ("The party asserting an affirmative defense bears the burden of proof.").

Nowhere does Section 432.047 contain any requirement that the "credit agreement" must be delivered to the other party. "Where the words are clear and

---

**6.** However, it is undisputed by the parties that Bailey did receive a letter from Lutz on Bank stationery dated February 26, 2009, which stated that it was a "confirmation of Hawthorn Bank's commitment to provide $510,000 in financing for acquisition and improvements relative to completing a restaurant kitchen and private banquet meeting room . . ." The letter set forth some of the other conditions the Bank placed on the making of the loan and Lutz was aware that the letter was provided to Briggs to assist in Bailey obtaining the required funds from her. The Bank's copy of this letter also contains all of the additional terms for the loan, which are written in Lutz's handwriting at the bottom of the letter.

unambiguous, rummaging among the statutory canons of construction to devise a different meaning is impermissible." *State ex rel. Missouri Pacific R. Co. v. Koehr*, 853 S.W.2d 925, 926 (Mo. banc 1993); *see also City of Wellston v. SBC Communications, Inc.*, 203 S.W.3d 189, 192 (Mo. banc 2006) ("[W]e enforce statutes as written, not as they might have been written."). Here, the lack of such a "delivery" requirement in the statute is dispositive of this issue. Moreover, the purpose of the commercial credit statute of frauds is met if the Bank officers and the Bank board have approved the written conditions and are aware a written commitment has been made.

█ Again, the Bank does not dispute that because Section 432.047 is in the nature of a statute of frauds, it should be interpreted similarly. *See also Mika v. Central Bank of Kansas City*, 112 S.W.3d 82, 90 (Mo.App. W.D.2003) ("Nothing in the language of § 432.045 either expressly or implicitly precludes the application of the established exceptions to the statute of frauds when dealing with an oral credit agreement."). In construing a statute, we "'must presume that the legislature was aware of the state of the law at the time of its enactment.'" *Suffian v. Usher*, 19 S.W.3d 130, 133 (Mo. banc 2000) (quoting *Matter of Nocita*, 914 S.W.2d 358, 359 (Mo. banc 1996)).

Simply put, the Bank has failed to establish that the applicable law pertaining to the statute of frauds has ever required the delivery of the written agreement. Indeed, the Missouri Supreme Court has held that "[t]he validity of the paper, as evidence of a contract itself, depends not upon its delivery, but upon its being made public for the purpose of serving as a memorandum of the contract." *Kludt v. Connett*, 350 Mo. 793, 168 S.W.2d 1068, 1071 (1943). The Court reached this holding based on the following reasoning, which is equally applicable to the instant case:

> The evil the statute seeks to guard against is the use of oral evidence to prove the contract. This is obviated by the production of the undelivered memorandum thereof. If produced from the defendant's own custody, it guards against the mischief that the statute was passed to prevent, just as well as if produced from the custody of the plaintiff. The plaintiff is the one likely to suffer by leaving the evidence of his bargain in the hands of the defendant—not the defendant himself.

*Id.*

█ Because the affirmative defense of Section 432.047 was inapplicable to the instant dispute, the ultimate issue of whether there was an enforceable contract between Bailey and the Bank was an issue for the jury to decide.[7] Therefore, we conclude that the trial court did not err in denying the Bank's JNOV motion in this regard.

Point One is denied.

In Point Two, the Bank argues that the "trial court erred in denying the Bank's motion for judgment notwithstanding the verdict because Bailey failed to make a submissible case of recoverable damages in that Bailey sought a multiple of lost future profits of a planned restaurant that had no record of profitability ... thus rendering his alleged damages improperly speculative." We disagree.

---

7. In this point, the parties on appeal dispute whether the February 26, 2009 letter ("Loan Commitment Letter") was an enforceable agreement pursuant to the statute. Because of our holding that the Loan Summary satisfied the statutory requirements of Section 432.047, we need not reach this issue.

The Missouri Supreme Court recently outlined our applicable standard of review:

> The standard of review of the denial of a JNOV is essentially the same as the overruling of a motion for directed verdict. *Klotz v. St. Anthony's Medical Center*, 311 S.W.3d 752, 769 (Mo. banc 2010). "A case may not be submitted unless each and every fact essential to liability is predicated on legal and substantial evidence." *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 756 (Mo. banc 2011) (quoting *Investors Title Co. v. Hammonds*, 217 S.W.3d 288, 299 (Mo. banc 2007)). To determine whether the evidence was sufficient to support the jury's verdict, an appellate court views the evidence in the light most favorable to the verdict and the plaintiff is given the benefit of all reasonable inferences. *Keveney v. Missouri Military Academy*, 304 S.W.3d 98, 104 (Mo. banc 2010). This Court will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion. *Klotz, supra.*

*Western Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 14 (Mo. banc 2012).

Upon the conclusion of trial, the jury found in favor of Bailey on his breach of contract claim and his negligent misrepresentation claim. The jury awarded Bailey $310,000 in actual damages, and $200,000 in punitive damages.

On appeal, the Bank alleges that the trial court erred in refusing to grant its JNOV motion because Bailey was not entitled to actual damages in light of the fact that the alleged damages were predicated on speculative lost future profits (that would have only been generated had Bailey been extended the loan by the Bank).

Bank is correct that "[t]he *general* rule as to recovery of anticipated profits of a commercial business is that they are too uncertain and dependent upon changing circumstances to warrant a judgment for their recovery." *Rissler v. Heinzler*, 316 S.W.3d 533, 538 (Mo.App. W.D. 2010) (emphasis added) (internal citation and quotation marks omitted). "The rule is well settled in this state that damages for the loss of anticipated profits resulting from actionable conduct of another 'are recoverable only when they are made reasonably certain by proof of actual facts which present data for a rational estimate of such profits.'" *Id.* (quoting *Yaffe v. Am. Fixture Inc.*, 345 S.W.2d 195, 199 (Mo. 1961)).

However, in *Ameristar Jet Charter, Inc. v. Dodson Intern. Parts, Inc.*, the Missouri Supreme Court clarified this specific area of law:

> The goal of awarding damages is to compensate a party for a legally recognized loss. *De Salme v. Union Elec. Light & Power Co.*, 232 Mo.App. 245, 102 S.W.2d 779, 782 (1937); *see also Sampson v. Mo. Pac. R. Co.*, 560 S.W.2d 573, 588 (Mo. banc 1978) (stating that the ultimate test for damages is whether the award will fairly and reasonably compensate the party for its injuries); DAN B. DOBBS, LAW OF REMEDIES § 3.1, at 210 (2d ed.1993). A party should be fully compensated for its loss, but not recover a windfall. *Weeks–Maxwell Constr. Co. v. Belger Cartage Serv., Inc.*, 409 S.W.2d 792, 796 (Mo.App.1966); DOBBS, § 3.1, at 210. In many contract and tort cases involving damage to persons, property or businesses, a party requests damages for loss of business profits. "In evaluating the sufficiency of evidence to sustain awards of damages for loss of business profits the appellate courts of this state

have made stringent requirements, refusing to permit speculation as to probable or expected profits, and requiring a substantial basis for such awards." *Coonis v. Rogers,* 429 S.W.2d 709, 713–14 (Mo.1968).

For an award of lost profits damages, a party must produce evidence that provides an adequate basis for estimating the lost profits with reasonable certainty. *Meridian Enters. Corp. v. KCBS, Inc.,* 910 S.W.2d 329, 331 (Mo.App.1995). "Loss of profits refers to the amount of net profits a plaintiff would have realized if its clients had not been lost as a result of a defendant's actions." *Id.* **While an estimate of prospective or anticipated profits must rest upon more than mere speculation, "[u]ncertainty as to the amount of profits that would have been made does not prevent a recovery."** *Gasser v. John Knox Village,* 761 S.W.2d 728, 734 (**Mo. App.1988**). **The claimant must establish the fact of damages with reasonable certainty, but it is not always possible to establish the amount of damages with the same degree of certainty.**

**In some cases, the evidence weighed in common experience demonstrates that a substantial pecuniary loss has occurred, but at the same time it is apparent that the loss is of a character which defies exact proof. In that situation, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the court or jury. This principle is applicable in the case of proof of lost profits.**

155 S.W.3d 50, 54–55 (Mo. banc 2005) (emphasis added).

Stripped to its essence, the Bank's argument is grounded in factual determinations that are beyond our purview. Specifically, the Bank argues that the existing wine and cheese business had not been profitable and that Bailey did not establish that his planned restaurant would be profitable. The Bank argues that the evidence was overwhelming that the Business Plan would never cover the necessary improvements to the restaurant and that Bailey's lost future profits improperly assumed the benefit of improvements that Bailey admitted would have taken years to complete.

But at trial, Bailey offered unrebutted expert testimony regarding his future, lost economic damages through the testimony of his expert, Cross. Cross is an experienced restaurateur who had personally owned more than a dozen successful restaurants in the same or nearby markets, and had also served as a consultant to approximately forty-five other restaurants in the same or nearby markets.

Bailey hired Cross, *after a referral from the Bank,* to prepare the comprehensive business plan ("Business Plan") for re-tooling his business, which included detailed financial projections for the restaurant over the next two years. Cross relied heavily on the Business Plan to arrive at his expert opinions as to the restaurant's future lost profits at trial. Ultimately, Cross testified it was his opinion that a fair value of a restaurant is typically a multiple of three times its earnings; based on his financial projections for the restaurant based on the Business Plan, it was his opinion that the value of the business was $536,000.[8]

It appears disingenuous for the Bank to argue that this Business Plan was too

---

8. In actuality, Cross testified that the value was "three times 182," which is actually $546,000.

speculative for the jury to determine damages when the Bank not only relied on this same Business Plan to determine whether or not to make the commitment to loan Bailey $510,000 for this business, but also recommended to Bailey the expert who drafted the plan. That fact was probably not lost on the jury.

Moreover, as noted above, this court will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion. *Western Blue Print*, 367 S.W.3d at 14. Also, as noted above, a claimant must "establish the fact of damages with reasonable certainty, but it is not always possible to establish the amount of damages with the same degree of certainty." *Ameristar*, 155 S.W.3d at 55. Where, as here, there was sufficient evidence to support the jury's verdict, we see no cause for reversal.

For all of the aforementioned reasons Point Two is denied.

 In Point Three, the Bank argues that the "trial court erred in denying the Bank's motion for judgment notwithstanding the verdict because Bailey failed to make a submissible case on his breach of contract claim in that enforcement of the terms in the alleged agreement is barred by Missouri's statute of frauds." This issue need not detain this Court.

 The Bank's argument is that statute of frauds, Section 432.010, barred Bailey's claim because, *inter alia*, the "Loan Summary, which clearly contemplated a five year term, could not be completed in one year and was thus subject to the writing and signature requirement of Sec-

tion 432.010." But Missouri law is clear that the statute of frauds defense is inapplicable if the agreement was "*capable* of being performed within one year." *Adams v. One Park Place Investors, LLC*, 315 S.W.3d 742, 748 (Mo.App. W.D.2010). "Our cases hold, consistently, that a contract is not unenforceable under the statute of frauds *if it could possibly be performed in compliance with its terms within one year, even though the actual performance is expected to continue over a much longer period.*" *Crabb v. Mid-American Dairymen, Inc.*, 735 S.W.2d 714, 716 (Mo. banc 1987) (emphasis added); [9] *see also Want v. Century Supply Co.*, 508 S.W.2d 515, 516 (Mo.App.1974) ("[T]he possibility that a contract may be performed within one year is sufficient to avoid the statute of frauds.").

Here, there can be no doubt that the agreement was capable of being performed within one year in that the Loan Summary was unambiguous that Bailey was allowed to pay off the note in full without any "prepayment penalty." While the contemplated term of the loan was twenty five years with a five year balloon, binding case law makes clear that notwithstanding this fact, the statute of frauds is not applicable to bar Bailey's claim.

Point Three is denied.

In Point Four, the Bank argues that the "trial court erred in denying the Bank's motion for judgment notwithstanding the verdict because Bailey and Briggs failed to make a submissible case on their negligent misrepresentation claims in that, as a matter of law, the identified representations were non-actionable statements of future intent, were true when offered, and Briggs

9. On appeal, the Bank insinuates that the Missouri Supreme Court held to the contrary in *Norden v. Friedman*, 756 S.W.2d 158, 162 (Mo. banc 1988). But while the Court stated in *Norden* that "if the contract was not to be performed within one year it would be within the statute," a close reading of *Norden* clarifies that it did not change this area of the law. *Id.*

failed to establish reliance or show damages therefrom."

 The Eastern District recently outlined the following applicable law:

"The purpose of motions for directed verdict and JNOV is to 'challenge the submissibility of the plaintiffs case.'" *Newell Rubbermaid v. Efficient Solutions*, 252 S.W.3d 164, 170 (Mo.App. 2007) (quoting *Coon v. Dryden*, 46 S.W.3d 81, 88 (Mo.App.2001)). "'A case is not to be submitted to the jury unless each fact essential to liability is predicated upon legal and substantial evidence.'" *Newell Rubbermaid*, 252 S.W.3d at 170 (quoting *Coon*, 46 S.W.3d at 88). *Rule 72.01(a) requires a motion for a directed verdict to "state the specific grounds therefore."* If a motion for directed verdict fails to comply with the requirements of Rule 72.01(a), then it "neither presents a basis for relief in the trial court nor preserves the issue in the appellate court." *Howard v. City of Kansas City*, 332 S.W.3d 772, 790 (Mo. banc 2011); *see also Pope v. Pope*, 179 S.W.3d 442, 451 (Mo.App.2005) (en banc); *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 163–64 (Mo.App.1997) (en banc). Mere conclusions and "bare generalities" are insufficient to preserve an error for our review. *Pope*, 179 S.W.3d at 452–54, 459.

* *

A sufficient motion for directed verdict at the close of all the evidence is required to preserve an issue for a motion for JNOV. *Id.* If the motion for directed verdict is insufficient, a "subsequent post-verdict motion is without basis and preserves nothing for review." *Howard*,

332 S.W.3d at 790; *Pope*, 179 S.W.3d at 451.

*Accordingly, a defendant's failure to file a motion for directed verdict which states the specific grounds therefor not only precludes the defendant 'from obtaining a judgment notwithstanding the verdict in its favor,' but also 'further precludes it from obtaining appellate review of the trial court's failure to enter judgment notwithstanding the verdict[.]'* *Id.* at 457 (quoting *Hatch v. V.P. Fair Foundation, Inc.*, 990 S.W.2d 126, 137–38 (Mo.App.1999)). *A party cannot save a defective motion for directed verdict by making specific allegations in the motion for JNOV.* Pope, 179 S.W.3d at 457–58.

*Marquis Financial Services of Indiana Inc. v. Peet*, 2012 WL 1005041, *1–2 (Mo. App. E.D.2012) (emphasis added).

Here, the Bank made an oral motion for directed verdict at the close of the plaintiffs' case.[10] However, in this oral motion, the Bank made an extremely cursory argument pertaining to plaintiffs' negligent misrepresentation claims. The Bank only argued the following:

Defendant would ask the Court for a directed verdict in his favor. This case was brought on theories of fraud and misrepresentation, breach of contract, and promissory estoppel. I think we argued in our motion for summary judgment that promissory estoppel is not an independent cause of action in itself.

I think the case law describes it as a shield and not a sword. It has not become an issue and there's no testimony or evidence in this case pertaining to promissory estoppel. The claims are in-

---

10. No written motion for directed verdict was filed by the Bank; notwithstanding this fact, the law is clear that this oral motion would have been sufficient to preserve this issue had

it been "specific." *See Sanders v. Ahmed*, 364 S.W.3d 195, 2012 WL 1114121, *6 (Mo. banc 2012).

effective by the failure of the loan to close as submitted that neither Kurt Lutz nor anyone from Hawthorn Bank misrepresented, lied or otherwise misled him to believe that they intended to make a loan.

He testified that he does not think that Mr. Lutz ever did anything other than attempt to make the loan. I think that's an admission by the party and I think that closes the door to the issue to those two particular causes of action. Supp Tr, pg. 3.[11]

■ On appeal, the Bank makes a variety of arguments that were never raised in its motion for directed verdict. For example, the Bank argues that "the identified representations were non-actionable statements of future intent," and thus plaintiffs' negligent misrepresentation claims failed pursuant to Missouri case law.[12] But because the Bank raised these arguments for the first time in its motion for judgment notwithstanding the verdict, it has failed to preserve these issues for appeal pursuant to the above case law. *Howard v. City of Kansas City*, 332 S.W.3d 772, 790–791 (Mo. banc 2011) ("Because the City did not argue against the submissibility of future damages in its motion for directed verdict, it has failed to preserve the issue for appeal," and the Missouri Supreme Court accordingly declined to review for plain error). This Court, likewise, exercises its discretion in declining to review these waived issues for plain error because the Bank does not request plain error relief, nor argue that a manifest injustice or miscarriage of justice has occurred. *See Gill Const., Inc. v. 18th & Vine Authority*, 157 S.W.3d 699, 724 (Mo.App. W.D.2004) (citing Rule 84.13(c)).

■ The only issue preserved for review in this Point Relied On is whether "Bailey and Briggs ... establish[ed] that any statement [by the Bank] was false" because in its Motion for Directed Verdict the Bank argued that no one "misrepresented, lied or otherwise misled him to believe that they intended to make a loan." "The elements that must be proven in order for a party to recover for negligent misrepresentation are: (1) the speaker supplied information in the course of his business; (2) because of the speaker's failure to exercise reasonable care, the information was false; (3) the information was intentionally provided by the speaker for the guidance of limited persons in a particular business transaction; (4) the hearer justifiably relied on the information; and (5) due to the hearer's reliance on the information, the hearer suffered a pecuniary loss." *Midwest Bankcentre v. Old Republic Title Co. of St. Louis*, 247 S.W.3d 116, 129–30 (Mo.App. E.D.2008). "If a party fails to prove one of the elements of his claim for fraudulent or negligent misrepresentation, his claim fails." *Id.*

■ We do not believe, pursuant to our deferential standard of review, that the Bank has demonstrated that Plaintiffs failed to make a submissible case as it pertains to this claim. While the Bank is correct that "[f]ailure to provide evidence that Defendant's statements were false is fatal to recovery for negligent misrepresentation," in this case Edward Bailey tes-

---

11. The Bank went on to argue why its motion for directed verdict should be granted as it pertained to Bailey's contract claim, but those were distinct and different arguments than those raised pertaining to the negligent misrepresentation claims.

12. In a similar fashion, the Bank failed to argue in its motion for directed verdict, the following arguments it now raises on appeal: (1) the "evidence does not support that Briggs justifiably relied on the representation" and (2) Briggs did not show that she suffered damage.

tified that he was told by the Bank "that they would loan the money" and that the $510,000 loan was never in fact extended to him. *Allen Quarries, Inc. v. Auge,* 244 S.W.3d 781, 785 (Mo.App. S.D.2008). Based on this evidence, we do not believe that we can conclude that there was "a complete absence of probative facts to support" the jury's verdict. *U.S. Neurosurgical, Inc.,* 303 S.W.3d at 664 ("If reasonable minds can differ on a question before the jury, we cannot disturb the jury's verdict on appeal.").

On appeal, the Bank attempts to re-cast the evidence adduced at trial in the light most favorable to its position by arguing that "Bailey testified that he did not believe Lutz ever lied to him." But the law is clear that "[t]o determine whether the evidence was sufficient to support the jury's verdict, an appellate court views the evidence in the light most favorable to the verdict and the plaintiff is given the benefit of all reasonable inferences." *Western Blue Print Co., LLC,* 367 S.W.3d at 14.

The Bank highlights the fact that Bailey testified to the following on cross-examination: "I think he intended early to make the loan. I just—I don't know why the change." But to meet his burden of proof at trial on this issue, all Bailey had to prove is that "because of the speaker's failure to exercise reasonable care, the information was false." *Midwest Bankcentre v. Old Republic Title Co. of St. Louis,* 247 S.W.3d 116, 129 (Mo.App. E.D.2008). As outlined above, we believe that the evidence, when viewed in the light most favorable to the jury's verdict, in fact supported the jury's verdict. Here, there was voluminous evidence that the Bank failed to follow through on its commitment to loan Bailey $510,000, thus creating a disputed issue for the jury to resolve at the close of all the evidence.

For all of these reasons, Point Four is denied.

Similarly, in Point Five, the Bank argues that the trial court "erred in denying the Bank's motion for judgment notwithstanding the verdict because Briggs failed to make a submissible case on her promissory estoppel claim in that a legal remedy was available and Briggs failed to prove the existence of a promise." We must reject the Bank's fifth Point Relied On for nearly identical reasons as articulated in Point Four.

To begin, the Bank argues that "Briggs did not establish the fourth element of her promissory estoppel claim" in that "Missouri courts have held repeatedly that the availability of a legal remedy precludes a promissory estoppel claim." But as outlined in detail in Point Four (and therefore will not be repeated), the Bank waived this issue by failing to raise it in its motion for directed verdict. Because the Bank has not sought plain error review, we exercise our discretion in refusing to embark upon that level of scrutiny on our own volition, as that would remove us from the role of neutral arbitrator and place us in the position as an advocate for one of the parties.[13]

13. We note *ex gratia* that "if an instruction is supportable by any theory, then its submission is proper." *Klotz v. St. Anthony's Medical Center,* 311 S.W.3d 752, 767 (Mo. banc 2010) (citations omitted), "A jury instruction is prejudicial only if it directs recovery on a different theory than what was pleaded and proved." *Burns Nat. Lock Installation Co., Inc. v. American Family Mut. Ins. Co.,* 61 S.W.3d 262, 270 (Mo. App. E.D. 2001) (citation omitted). Given that the jury returned a verdict in favor of Briggs under both negligent misrepresentation and promissory estoppel, a review of the record and the law indicates that the objections the Bank makes for the first time on appeal resulted at most in harmless error. *See Mathes v. Sher Express, L.L.C.,* 200 S.W.3d 97, 107 (Mo. App. W.D.

Finally, the Bank argues that "Briggs failed to prove the existence of a promise" by the Bank. Again, based on our standard of review, this argument must fail. "A claim of promissory estoppel has four elements: (1) a promise; (2) on which a party relies to his or her detriment; (3) in a way the promisor expected or should have expected; and (4) resulting in an injustice that only enforcement of the promise could cure." *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. banc 2007). "The promise giving rise to the cause of action must be definite, and the promise must be made in a contractual sense." *Id.* "A promise is a 'manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.'" *Prenger v. Baumhoer*, 939 S.W.2d 23, 26 (Mo.App. W.D. 1997) (quoting Restatement (Second) of Contracts, § 2 (1981)).

Briggs established sufficient evidence at trial that the Bank made a "promise," so as to make a submissible issue on her promissory estoppel claim. Specifically, Lutz's February 26, 2009 Loan Commitment Letter begins as follows: "Please accept this letter as confirmation of Hawthorn Bank's commitment to provide $510,000 in financing." The Bank was aware that Bailey used this "commitment" from the Bank to obtain the loan from Briggs. Furthermore, Lutz provided the following testimony at trial:

Q. So that we can get to the bottom line very quickly and there's no doubt, did the bank agree, in fact, to make a loan to Mr. Bailey for $510,000?

2006) (the verdict form "accurately posited the issues to be determined by the jury on each theory of liability, and was, therefore, properly utilized by the trial court. The verdict form used would also have the potentially

A. I would say yes, we did.
Tr. 233.

Accordingly, Point Five is denied.

### Cross–Appeal

Plaintiffs raise Three Points in their cross-appeal. In Point One, plaintiffs argue that the "trial court erred in granting respondent's motion for JNOV as to punitive damages because appellant Edward Bailey made a submissible case for punitive damages in that a reasonable jury concluded that respondent's conduct was outrageous because of its evil motive or reckless indifference." We agree.

This Court recently outlined the following applicable law:

"Essentially, a JNOV motion is a challenge to the submissibility of the case." *Koppe v. Campbell*, 318 S.W.3d 233, 239 (Mo.App. W.D.2010) (internal quotation omitted). "We review a trial court's grant of a motion for JNOV *de novo* and must determine whether the plaintiff made a submissible case." *Id.* "To make a submissible case, a plaintiff must present substantial evidence that tends to prove the facts essential to plaintiff's recovery." *Id.* "Substantial evidence is competent evidence from which the trier of fact can reasonably decide the case." *Livingston v. Baxter Health Care Corp.*, 313 S.W.3d 717, 724 (Mo.App. W.D.2010) (internal quotation omitted). Thus, our review of this case is limited to "whether or not, as a matter of law, the plaintiff presented enough evidence to submit his claim of punitive damages to the jury." *Horizon Memorial Grp., L.L.C. v. Bailey*, 280 S.W.3d 657, 661 (Mo.App. W.D. 2009).

salutary purpose of avoiding a retrial in the event that some error or insufficiency of evidence was found in only one of the verdict directing theories.").

"[W]e review the evidence and all reasonable inferences that can be drawn from that evidence in a light most favorable to the verdict, and we disregard all contrary evidence and inferences." *Id.* **"There is a presumption favoring the reversal of a [JNOV]."** *Laws v. St. Luke's Hosp.,* 218 S.W.3d 461, 466 (Mo. App. W.D.2007). **Such presumption will not be overcome unless "the evidence and inferences favorable to the plaintiff leave no room for reasonable minds to conclude that [the plaintiff] made a submissible case."** *Horizon Memorial Grp.,* 280 S.W.3d at 662.

To make a submissible case for punitive damages, there must be "clear and convincing proof of [a defendant's] culpable mental state." *Drury v. Mo. Youth Soccer Ass'n,* 259 S.W.3d 558, 573 (Mo.App. E.D.2008). Thus, "a plaintiff makes a submissible case for punitive damages when he presents clear and convincing evidence from which a reasonable jury could conclude that the defendant had an evil motive." *Horizon Memorial Grp.,* 280 S.W.3d at 663.

A plaintiff establishes a defendant's culpable mental state "by showing either that the defendant committed an intentional wanton, willful, and outrageous act without justification *or acted with reckless disregard for the [plaintiffs] rights and interest." Id.* (emphasis added). Thus, a jury can infer the defendant's evil motive when the defendant recklessly disregards the interests and rights of the plaintiff. *Drury,* 259 S.W.3d at 573. Likewise, " '[i]f a defendant intentionally does a wrongful act, and knows at the time the act is wrongful, it is done wantonly and with a bad motive.' " *Claus v. Intrigue Hotels, LLC,* 328 S.W.3d 777, 783 (Mo.App. W.D.2010) (quoting *Williams v. Trans States Airlines, Inc.,* 281 S.W.3d 854, 870 (Mo.App. E.D.2009)).

*J.M. Neil & Associates, Inc. v. Alexander Robert William, Inc.,* 362 S.W.3d 21, 23–4 (Mo.App. W.D.2012) (bold font added).

In arguing that the trial court properly granted their JNOV motion as it pertained to the punitive damage award, the Bank argues that "Bailey offers no evidence that the Bank acted with an evil motive, or a willful, wanton or malicious culpable mental state." But the Bank ignores on appeal that "a jury can infer the defendant's evil motive when the defendant recklessly disregards the interests and rights of the plaintiff." *J.M. Neil & Associates, Inc.,* 362 S.W.3d at 24. Likewise, "if a defendant intentionally does a wrongful act, and knows at the time the act is wrongful, it is done wantonly and with a bad motive." *Id.* (citations and quotations omitted).

This case was full of circumstantial evidence that the Bank, knowing that Bailey was exposed to large losses, and was depending on the Bank for the loan, callously refused to even inform him in a timely fashion that the Bank was *not* going to make the loan. Viewed in the light most favorable to the jury's verdict, Bailey presented clear and convincing evidence from which the jury could have concluded that the Bank acted with reckless disregard for Bailey's rights and interests and thereby possessed the requisite evil motive for purposes of punitive damages. The evidence showed that Bailey was diligent in pressing the Bank to close the loan. Here, the evidence allowed the jury to conclude that the Bank committed to make the loan and then simply ignored Mr. Bailey's repeated inquiries and pleas to close on the $510,000 loan, and knew that doing so would adversely affect Bailey. A reasonable jury could regard that conduct as outrageous.

On appeal, the Bank offers multiple purported excuses as to why it did not close on the loan, but there was sufficient evi-

dence from which the jury could reject these excuses. For example, the Bank argues on appeal that it "became busy with the month and quarter end for financial reports plus a review by bank examiners." The business world is a busy one indeed, but the Bank fails to cite any authority whatsoever that businesses are allowed to recklessly and callously disregard their commitments to customers because of merely having a *full schedule*. Here, the evidence is clear that the Bank decided, at some point, not to follow through with the proposed loan to Bailey. But it never informed Bailey of this decision (and instead merely gave excuses, some of which bordered on the ridiculous),[14] which simply highlights how the Bank recklessly and wantonly disregarded Bailey's interests and rights.

The Bank further argues that there was no evidence presented at trial that "the Bank knew or had reason to know there was a high probability that its action would result in injury." We disagree.

There was abundant evidence and the Bank admitted at trial that it knew that time was of the essence, and that Bailey needed to get this loan closed in order to succeed in his business plan, as discussed above. Specifically, the Bank knew that Bailey was entering into a contract to purchase the building prior to closing on the loan, because it was a prerequisite *required by the Bank* for the loan to close in light of the fact that the loan was to be secured by that real estate. In other words, the Bank would not have loaned Bailey the money had he not first purchased the real estate so that the Bank could secure its interest in the loan with a deed of trust. In a similar fashion, the Bank was also aware that Bailey was borrowing $120,000 from his sister (through mortgaging her previously unencumbered home) because the Bank also required that Bailey be current on his other loans with the Bank prior to closing on the transaction in question, and the Bank also knew that these borrowed funds were needed to make his delinquent loans current.

Simply put, the evidence presented at trial allowed the jury to conclude that the Bank had all the power to close on the loan in a timely fashion, and its failure to do so was intentional, wanton, and in reckless disregard of Bailey's rights and interests. On appeal, the Bank asserts that the jury heard evidence that Bailey did not have "the funds to close" pursuant to their agreement, and that "[t]here was no sense in going through [further formalities in the lending process] until we had that concern alleviated." Here, there were voluminous email communications (which were admitted into evidence at trial) between Bailey and the Bank regarding when the loan would close. But the Bank failed to articulate that it had concerns that Bailey would not have the funds to close, and had the Bank articulated these concerns, Bailey might have been able to take steps to alleviate those concerns, or find alternative funding.

---

14. To give just a few examples, when Bailey inquired to Lutz as to why it was taking so long to close on the loan, Lutz admitted on cross-examination that he responded that he was busy because "my youngest son graduated from high school on Friday and I had multiple parties to attend and host a lot of family in town."

Additionally, while it is true that the parties agreed that the property had to be appraised, it is disingenuous of the Bank to blame the appraiser for the delay by failing to provide the requisite appraisal until March 31. Specifically, the Bank chose the appraiser, never inquired if the appraiser would be able to timely provide the appraisal and in fact waited until twelve days before the closing of the real estate contract to even send a letter to the appraiser requesting that the appraisal be conducted.

Certainly, based on this evidence, the jury was also free to conclude that the Bank knew that, by failing to give Bailey prompt notice of its ultimate decision to refuse to close on the loan as promised, it was creating a series of events that would lead to catastrophic financial disaster for Bailey and his business. Had the Bank given Bailey prompt notice that it was backing out on the loan commitment, Bailey certainly could have made appropriate changes, such as closing down his business much sooner, in order to stop the financial bleeding or even obtained financing from another lender.

In short, the jury could have found that the extensive series of e-mails and communications between Bailey and the Bank's representative Lutz, showed a series of unacceptable delays in closing this loan under the circumstances and that if the Bank was in fact having second thoughts about the viability of the loan, the Bank failed to timely notify Bailey of those concerns so that he could have attempted to either address them with the Bank or seek alternative financing before it became too late to salvage the business.

Ultimately, pursuant to our applicable standard of review, we conclude that the trial court's order granting the JNOV motion pertaining to punitive damages must be reversed. *Laws v. St. Luke's Hosp.*, 218 S.W.3d 461, 466 (Mo.App. W.D.2007) (citation and quotation omitted).

("There is a presumption favoring the reversal of a judgment notwithstanding the verdict."). Here, the Bank has simply failed to overcome this presumption through illustrating that the evidence somehow left "no room for reasonable minds to conclude that the plaintiff made a submissible case" as it pertained to puni-

tive damages. *J.M. Neil & Associates, Inc.*, 362 S.W.3d at 24.[15]

For all of these reasons, Point One of the cross appeal is granted.

Rule 84.14 provides that "the appellate court shall award a new trial or partial new trial, reverse, or affirm the judgment or order of the trial court, in whole or in part, or *give such judgment as the court ought to give*. Unless justice otherwise requires, the court shall dispose finally of the case." *Id.* (emphasis added.) "Rule 84.14 permits us to enter the judgment that the trial court ought to give, and unless justice otherwise requires, we shall dispose finally of the case." *In re Estate of A.T.*, 327 S.W.3d 1, 3–4 (Mo.App. E.D. 2010).

Therefore, pursuant to Rule 84.14, we order that the jury's verdict be reinstated, which awarded Bailey $200,000 in punitive damages on his negligent misrepresentation claim.

In Point Two on the cross appeal, Bailey argues that the "trial court erred in denying [plaintiffs'] post-trial motion for prejudgment interest because prejudgment interest was required under either Section 408.020 or under equitable principles in that [plaintiffs'] actual damages for breach of contract and promissory estoppel were liquidated and [plaintiffs] were entitled to compensation for the time-value of money." We disagree.

Here, plaintiffs complain that the trial court erred in refusing to award them prejudgment interest in the amount of $53,812.35 for Bailey and $20,830.66 for Briggs. On appeal, plaintiffs ground their claims in two distinct legal theories, neither of which was actually raised before

**15.** A substantially different analysis would be applicable had the trial court granted a new trial on this issue as opposed to granting

JNOV. *Koppe v. Campbell*, 318 S.W.3d 233, 240 (Mo.App. W.D.2010).

the trial court: (1) Section 408.020 and (2) "equitable principles."

■ After the jury entered its verdict, plaintiffs filed a motion for prejudgment interest, but in that motion plaintiffs did not raise these specific legal grounds they now raise on appeal. In order to preserve the issue for our review, requests for prejudgment interest must be made before the trial court and failure to do so requires this Court to "review for plain error only." *Realty Resource, Inc. v. True Docugraphics, Inc.*, 312 S.W.3d 393, 400 (Mo.App. E.D.2010).

■ Here, it is undisputed that, in their motion, plaintiffs did not seek prejudgment interest based on the distinct doctrine of "equitable principles," and thus that issue was not preserved for appeal. *See generally Carpenter v. Countrywide Home Loans, Inc.*, 250 S.W.3d 697, 704 (Mo. banc 2008). Furthermore, as admitted by counsel on appeal, plaintiffs' "motion for prejudgment interest mistakenly referenced Section 408.040, but should have referenced Section 408.020."[16] Accordingly, we conclude that these issues have been waived for the purposes of this appeal because plaintiffs have failed to demonstrate that a manifest injustice somehow resulted below.

■ *Ex gratia*, we further note that even had plaintiffs made a request for prejudgment interest pursuant to Section 408.020, they would not have been entitled to that relief in light of the fact that their damages were "unliquidated." Section 408.020 permits an award of prejudgment interest "for all moneys after they become due and payable, on written contracts ... after they become due and demand of payment is made[.]" *Id.* Three requirements must be met before such interest can be awarded on a claim: "(1) the expenses must be due; (2) *the claim must be liquidated or the amount of the claim reasonably ascertainable*; and (3) the obligee must make a demand on the obligor for the amount due." *Jablonski v. Barton Mut. Ins. Co.*, 291 S.W.3d 345, 350 (Mo. App. W.D.2009) (emphasis added). "A prevailing party is not entitled to prejudgment interest on unliquidated damage claims because the defending party does not know the amount owed and, thus, is not in default for failing to pay." *Id.* "As a general rule, damages are liquidated when the amount due is fixed and determined or readily ascertainable by computation or a recognized standard." *Id.*

While "[o]ur court has recognized that damages may be ascertainable even if there is a dispute over monetary value or the parties' experts compute different estimates of the loss," even plaintiffs acknowledge on appeal that it is unclear *how* the jury arrived at its award of damages. *Jablonski*, 291 S.W.3d at 350; *see also* Br, pg. 9 ("The total of all damages was $510,000, the precise amount of the new loan that was promised. Although it cannot be known how the jury arrived at this allocation, it is evident that the jury wanted to award Mr. Bailey in some fashion

---

**16.** Plaintiffs argue that they should not have been required to cite the specific legal basis from which they believe they were entitled to the prejudgment interest because the distinction between Section 408.040 and 408.020 is immaterial. We disagree. Section 408.040 pertains to pre-judgment interest in "tort" claims, while Section 408.020 pertains to "written contracts"; accordingly, the statutory requirements are different depending on the statute implicated. *See* Sections 408.020 and 408.040. It is not for the trial court or opposing counsel to discern for plaintiffs what statutory basis they truly thought was grounds for pre-judgment interest. Regardless, as explained below, even had plaintiffs raised this issue pursuant to Section 408.020, they still would not have been entitled to that relief as a matter of law.

total damages equal to the principal amount of the loan."). Ultimately, however, plaintiffs acknowledge that Bailey's damages were based on lost future profits, not on the amount of the actual loan. Bailey fails to cite any authority that would allow this Court to conclude that lost future profits are "readily ascertainable."[17] To the contrary, as previously addressed, "[t]he general rule as to recovery of anticipated profits of a commercial business is that they are too uncertain and dependent upon changing circumstances to warrant a judgment for their recovery." *Rissler*, 316 S.W.3d at 538. Therefore, we conclude that the trial court did not err in refusing to grant plaintiffs prejudgment interest pursuant to Section 408.020.

Furthermore, we must reject Plaintiffs' alternate argument that "[p]rejudgment interest should have been awarded under equitable principles as well." To repeat, this argument was waived by Plaintiffs because it was never raised before the trial court as a basis of recovery for prejudgment interest. Even when assuming *arguendo* that plaintiffs had made this argument before the trial court, we do not believe that it would have been an abuse of discretion to deny this prejudgment interest request on the basis of equity. *Carpenter v. Countrywide Home Loans, Inc.*, 250 S.W.3d 697, 704 (Mo. banc 2008) ("[T]he determination of whether to allow prejudgment interest resides in the discretion of the trial court."). Here, as explained above, plaintiffs' damages were not readily ascertainable prior to trial, so the instant matter is distinguishable from *Carpenter*. ("In this case, each class member will have a *certain* date that the unauthorized fee was charged and the *amount of the fee is known*. There is no reason why

they would not be entitled to recover the time value of this sum. Countrywide was not authorized to charge this fee nor should it be allowed *to retain the time value of the money collected.*"). Prior to trial, Plaintiffs' damages were simply not as readily ascertainable as in *Carpenter*, and thus the trial court did not plainly err in refusing to award prejudgment interest on an equity basis.

For all of the aforementioned reasons, Point Two of the cross appeal is denied.

Finally, in Point Three of the cross-appeal, plaintiffs argue that the "trial court erred in denying appellant Edward Bailey's post-trial motion for attorney's fees [in the amount of $76,500] because such fees are recoverable under Section 408.092 in that the appellant Bailey was the prevailing party in his action to enforce a credit agreement." We disagree.

On appeal, Bailey does not dispute that he did not seek attorney's fees in his amended petition, which by itself is fatal to his argument on appeal. "Attorney's fees are special damages, *Miller v. Higgins*, 452 S.W.2d 121, 125 (Mo.1970), which must be specifically pleaded in order to be recovered." *Washington University v. Royal Crown Bottling Co. of St. Louis*, 801 S.W.2d 458, 470 (Mo.App. E.D.1990); *see also Ridgway v. TTnT Development Corp.*, 126 S.W.3d 807, 818 (Mo.App. S.D.2004) ("The trial court erroneously applied the law by awarding attorney fees to the Ridgways when their petition did not request such relief.").

Furthermore, even had he properly pled and sought his attorney's fees, Bailey has failed to demonstrate that

---

17. It is also worth noting that because Briggs's claims were based on the Bank's tortious conduct after she lent her brother $120,000, Section 408.020 would *not* apply because that statute only pertains to claims sounding in contract. See Section 408.020. Here, Briggs does not dispute that she never entered into a contract with the Bank.

the trial court somehow erred in denying his request. Section 408.092 is clear and unambiguous that it applies only to actions that seek "to enforce a credit agreement." *See* Section 408.092 ("[A]ttorneys' fees are permitted to enforce a credit agreement ...."). "The primary rule of statutory interpretation is to effectuate legislative intent through reference to the plain and ordinary meaning of the statutory language." *State ex rel. Valentine v. Orr,* 366 S.W.3d 534, 540 (Mo. banc 2012). "When the words are clear, there is nothing to construe beyond applying the plain meaning of the law." *Id.* (citation and quotation omitted). "Enforce" is defined as "to give force to; to carry out effectively." *See Merriam–Webster Dictionary,* http://www.merriam-webster.com/dictionary/enforce.

In the instant lawsuit, Bailey brought a claim for breach of contract, but he did not demand that the Bank be forced to loan him $510,000, or that in some other sense that the Bank be forced to carry out the agreement or contract that they had reached. Rather, Bailey simply sought damages for profits and expenses that he lost due to the loan not closing. Thus, in using the plain and ordinary meaning of the statute, it cannot be concluded that Bailey sought to "to enforce a credit agreement" pursuant to Section 408.092.

For all of these reasons, Point Three is denied.

## Conclusion

The judgment of the circuit court is hereby affirmed in part, and reversed in part. Bailey's first Point Relied On in the cross-appeal is granted. Pursuant to Rule 84.14, we order that the jury's verdict be reinstated, and we accordingly enter judgment in Bailey's favor for $200,000 in punitive damages on his negligent misrepre-

sentation claim. In all other respects, the trial court's judgment is affirmed.

All concur.